**The STATE of Ohio, Appellee,**

v.

**MONFORD, Appellant.**

[Cite as *State v. Monford,* 190 Ohio App.3d 35, 2010-Ohio-4732.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

No. 09AP–274.

Decided Sept. 30, 2010.

40

Ron O'Brien, Franklin County Prosecuting Attorney, and Seth L. Gilbert, Assistant Prosecuting Attorney, for appellee.

Yeura R. Venters, Franklin County Public Defender, and Allen V. Adair, Assistant Public Defender, for appellant.

CONNOR, Judge.

{¶ 1} Defendant-appellant, Larue A. Monford ("defendant"), appeals from the judgment of the Franklin County Court of Common Pleas, entered upon a jury verdict convicting him of murder, attempted murder, and felonious assault, all with firearm specifications, and one count of carrying a concealed weapon. For the reasons that follow, we affirm that judgment.

{¶ 2} Defendant's convictions arise from an incident that occurred on the afternoon of February 7, 2008, at a bar known as D# 1 Happy Family, located on St. Clair Avenue, in Franklin County, Ohio. On that date, Alicia Brown went to D# 1 Happy Family to meet Eugene Brown, a local disc jockey, to pick up concert tickets. Upon her arrival, Alicia saw defendant. Although the two had never previously met, they exchanged brief pleasantries. A short while later, Eugene arrived at the bar and he and Alicia sat next to one another and had a few drinks together. Lenora Edwards and Cornell Rhodes were also seated at the bar.

{¶ 3} Shortly before 3:00 p.m., defendant approached the bar and spoke with Eugene. Defendant put down a $20 bill and bought a round of drinks for his "friends" at the bar, telling the bartender, Latayia Cummings to keep the change, which was about $10. Defendant then walked to the back room of the bar and spoke with Antoinette Lee ("Toni"). After conversing for a little while, the two of

them returned to the bar's front room. Defendant then approached the bar and inquired about his money. Defendant approached Eugene from behind and demanded that Eugene give him his money. Eugene was still seated next to Alicia. As Eugene turned to face defendant, defendant again demanded his money and shot Eugene in the back. As a result of the gunshot wound, Eugene died at the scene.

{¶ 4} After the gunshot, Alicia stood up and started running toward the bathroom. Defendant fired twice at Alicia. Alicia was struck in the left hip and the right buttock. Defendant then left the bar through the back door, got into his vehicle, and drove away. Frank McKnight, who had been acquainted with defendant off and on for approximately 16 years, witnessed defendant driving away in a vehicle displaying temporary tags.

{¶ 5} In the hours following the shooting, Columbus police received an anonymous tip that pointed to defendant as the shooter. As a result, defendant's photograph was released to the local media and was subsequently aired on the local news.

{¶ 6} At the scene, police recovered three shell casings. The day after the shooting, police located a vehicle at the address listed on defendant's driver's license that matched the general description of the vehicle allegedly driven by the shooter and seen leaving the D# 1 Happy Family bar. Like the vehicle leaving the bar, this vehicle also had temporary tags. The vehicle was registered to Connie Senate. Upon reaching Connie Senate's residence, officers located and arrested defendant.

{¶ 7} Also on February 8, 2008, the day after the shooting, Columbus Police Homicide Detective Steven Glasure went to the hospital and showed Alicia a photo array containing defendant's driver's license photograph. She positively identified defendant as the shooter and marked her initials on defendant's photo.

{¶ 8} Approximately two weeks later, Detective Glasure developed a photo array containing a more recent photograph of defendant and showed that array to Latayia and Cornell. Both positively identified defendant as the shooter.

{¶ 9} On February 15, 2008, defendant was indicted by the Franklin County Grand Jury on one count of murder, one count of attempted murder, and one count of felonious assault. All three offenses were indicted with three-year firearm specifications. Defendant was also indicted on one count of carrying a concealed weapon. At his arraignment on February 20, 2008, defendant entered general pleas of not guilty and Attorney Myron Shwartz was appointed to represent him. Later, on April 24, 2008, the trial court granted leave for defendant to enter written pleas of not guilty by reason of insanity. On that

same date, the trial court also appointed Kristen E. Haskins, Psy.D., to interview and evaluate defendant with respect to those pleas.

{¶ 10} Because Attorney Shwartz was in ill health, the trial court appointed Attorney Tracy A. Younkin as co-counsel for defendant in August 2008. A suppression hearing was held on September 3, 2008, regarding defendant's motion to suppress all identification evidence. At the suppression hearing, the state of Ohio offered the testimony of Alicia, Latayia, Lenora, Frank, and Detective Glasure, as well as the testimony of security video surveillance technician Ronnie Williams. Defendant did not offer any witnesses on his behalf.

{¶ 11} During the hearing, Alicia and Latayia both affirmed their identification of defendant as the shooter using the photo arrays previously shown to them after the shooting. Detective Glasure testified that while presenting the photo arrays, he did not indicate to either witness which photo she should select, nor did he indicate whether the suspect was or was not in the array. In addition, Alicia and Latayia both made in-court identifications of defendant. While Lenora had not previously made an out-of-court identification of defendant as the shooter, she identified defendant during the hearing as the person who shot Eugene. Frank also made an in-court identification, asserting that defendant was the person he saw driving away from the bar and the person whom Lenora claimed had shot Eugene.

{¶ 12} Following the hearing, the trial court denied defendant's motion to suppress the identification, finding that the identifications were neither unnecessarily suggestive nor unreliable.

{¶ 13} Prior to the trial, on October 21, 2008, the trial court held a hearing to permit defendant to address any concerns he had with his representation, due to a complaint that he had filed with the bar association. During the hearing, defendant indicated that his issues were mostly with Attorney Shwartz and his on-going health issues. Defendant indicated that he had recently spoken with his other attorney, Attorney Younkin, and that most of the issues had been resolved. The trial court also permitted defendant to address the issue of bond and in fact, set a new bond. Following the hearing, the court subsequently authorized funds for defendant to retain an expert on eyewitness identification. In December 2008, just a few days before trial was scheduled to begin, Attorney Shwartz passed away, leaving Attorney Younkin to proceed without co-counsel.

{¶ 14} Just prior to opening statements, defendant again voiced concerns about his attorney, complaining that the expert witness had been retained only one week prior to trial and that his attorney had not been to see him in the last two weeks. However, upon the court's inquiry, defendant indicated that he was ready to proceed to trial with Attorney Younkin.

{¶ 15} In his opening statement, defendant's counsel put forward an alibi defense, claiming that defendant was not at the bar at the time of the shooting, but instead was at home. Ultimately, however, defendant did not provide any evidence of an alibi. Additionally, counsel for defendant did not mention or put on any evidence with respect to a plea of not guilty by reason of insanity.

{¶ 16} During trial, the state presented the testimony of multiple witnesses, including various police witnesses. Most relevant to this appeal is the testimony of Alicia, Latayia, Cornell, Lenora, Frank, and Detective Glasure.

{¶ 17} Alicia testified that defendant shot Eugene from behind and also shot her in the left hip and the right buttock. She made a positive in-court identification of defendant as the shooter. On cross-examination, Alicia testified that she heard that the suspect's photograph had been shown on the local news but that she did not see his picture on the news until after the incident, and she never heard his name on the news. She also testified that she did not actually see defendant shoot her, since her back was to him as she was running away.

{¶ 18} Latayia testified that she had served defendant approximately three times in the hour and a half prior to the shooting and that he was only a few feet away from her when she served him. Latayia again affirmed her identification of defendant made via a photo array in late February 2008 and also made an in-court identification of defendant as the shooter. On cross-examination, Latayia testified that she saw a gun in defendant's right hand and heard the gunshot, but she did not actually witness defendant shoot Eugene. In addition, Latayia testified that she heard defendant's name on television in connection with the shooting and also saw defendant's photograph on television after he was arrested but before she selected his photograph from the photo array.

{¶ 19} Cornell testified that he had known defendant for a few years and had seen him at other clubs in the past. He testified that defendant greeted him that afternoon with a handshake and a bear hug. He positively identified defendant as the shooter. He also testified that he witnessed defendant point the gun at Alicia and shoot at her.

{¶ 20} Lenora testified that she did not know defendant, but that she witnessed him put a gun in Eugene's back and shoot Eugene. She also saw defendant chase and shoot Alicia. She subsequently saw defendant leave through the back door as if he had not done anything. When she ran outside to the bridge, Lenora saw defendant give the "peace" sign. She testified that she pointed him out to Frank and told Frank that he was the shooter.

{¶ 21} Frank testified that he had known defendant for many years and had seen him around at various places, sometimes exchanging friendly conversation with him. He made an in-court identification of defendant as the person he saw

driving out of the parking lot after the shooting with the 30–day tags and as the person who was identified to him by Lenora as the shooter.

{¶ 22} Detective Glasure also testified during trial. Detective Glasure testified that he prepared both photo arrays containing defendant's photo. He testified that Alicia immediately and without hesitation selected defendant's photo from the array he created that included defendant's driver's license photo. He later created a second array that included a more recent photograph of defendant, which he showed first to Latayia and then to Cornell. Latayia immediately selected defendant as the shooter. When Detective Glasure showed the photo array to Cornell, Cornell also selected defendant and became very emotional.

{¶ 23} Ronnie Williams, a security-video technician who was also a regular at the D#1 Happy Family bar, testified that he had installed a security camera system for the bar several years prior to the shooting. He testified regarding the clips and photos he had prepared from the stored images captured by the security camera system.

{¶ 24} Prior to the state resting its case, the parties stipulated that Eugene died on February 7, 2008. The cause of death was stipulated as a homicide. An autopsy performed by William A. Cox, M.D., of the Franklin County Coroner's Office indicated that Eugene died from a perforation of the aorta as a consequence of a gunshot wound to the back.

{¶ 25} Defendant presented the testimony of two witnesses: Solomon M. Fulero, Ph.D., J.D., an expert witness on the challenges associated with memory and eyewitness-identification testimony, and Toni, a patron at D#1 Happy Family bar who had also testified in the state's case-in-chief.

{¶ 26} Dr. Fulero testified regarding the three stages of memory: (1) putting information into memory, (2) retaining the information, and (3) retrieving the information. He testified that various factors can affect the reliability of the information put into one's memory, such as the witness's exposure time. Obviously, the longer a witness has to view an event, the more accurate his or her memory is likely to be. However, the acquisition of memory can be affected by factors such as stress, drugs and alcohol, or the presence of a weapon, all of which could distract the witness or interfere with the ability to acquire information.

{¶ 27} According to Dr. Fulero's testimony, most memory is lost in the first eight hours after the event. Additionally, post-event information, such as viewing a suspect's photograph on television, can alter a witness's memory, since there is a risk that the photo will become familiar to the witness, and the witness may associate that familiarity with the individual involved in the crime, thereby

resulting in the television photo becoming the basis for a subsequent identification. This is known as unconscious transference.

{¶ 28} Dr. Fulero compared memory to a word-processing document on a computer in which changes to the document are incorporated into the original draft. Similarly, he testified that information acquired after an event can be incorporated into a witness's memory as if it occurred at the original time of the event, without the witness being aware of the alteration to the original memory.

{¶ 29} Several recommended procedures were offered by Dr. Fulero to make a photo-array identification more reliable. These included (1) using the double-blind method when presenting photo arrays, (2) using a sequential presentation of photos as opposed to a simultaneous presentation or "six pack" method, (3) constructing the lineup to avoid bias or suggestiveness, such as by using uniform backgrounds so that no one picture stands out and by matching the filler photos to the description of the suspect, rather than the photo of the suspect, and (4) declining to provide any postidentification feedback to the witness, because it can distort the witness's confidence level.

{¶ 30} Furthermore, Dr. Fulero testified that research has demonstrated there is no correlation between a witness's confidence in his or her identification and the actual accuracy of that identification.

{¶ 31} Defendant's last witness was Toni Lee. During the state's case, Toni testified that she had met defendant on a couple of occasions prior to the shooting that occurred on February 7, 2008. On the day of the shooting, she had a conversation with defendant regarding the disrespectful attitude displayed by today's youth. Shortly thereafter, as she was getting ready to leave the bar, she saw defendant pull a gun out of his pocket and shoot Eugene. She also witnessed Alicia jump up and run before getting shot. When she was re-called during defendant's case-in-chief, Toni acknowledged that on the night of the shooting, she told police that the shooter was approximately 5'6". Defendant is significantly taller than 5'6".

{¶ 32} On December 17, 2008, the jury found defendant guilty of murder, attempted murder, and felonious assault, and further found him guilty of the three-year firearm specifications. Additionally, the jury found defendant guilty of one count of carrying a concealed weapon.

{¶ 33} A sentencing hearing was held on January 15, 2009. The trial court imposed an aggregate sentence of 28 years to life in prison. Specifically, defendant received 15 years to life for the murder, ten years for the attempted murder, eight years for the felonious assault, and 12 months for the concealed-weapon offense. The attempted-murder, felonious-assault, and concealed-weapon

offenses were run concurrently to one another, but consecutively to the murder. Plus, an additional three years was imposed for the firearm specification.

{¶ 34} Defendant has filed a timely appeal, asserting the following eight assignments of error for our review:

First Assignment of Error: The trial court erroneously overruled defendant's pretrial motion to suppress identification.

Second Assignment of Error: The prosecutor engaged in misconduct by utilizing the hearing on appellant's motion to suppress identification as a one-on-one showup for witnesses who had not previously made an out-of-court identification, and to obtain an initial in-court identification from those who had.

Third Assignment of Error: Counsel's failure to undertake meaningful inquiry during voir dire, and failure to excuse a plainly objectionable juror, denied appellant his Sixth Amendment and Article I, Section 10 right to the effective assistance of counsel.

Fourth Assignment of Error: Failure to address appellant's plea of not guilty by reason of insanity, or to instruct the jury on insanity denied appellant his right to due process and trial by jury. Such omissions constituted structural error.

Fifth Assignment of Error: Appellant's convictions were not supported by legally sufficient evidence identifying him as the person responsible for the shootings at issue.

Sixth Assignment of Error: Attempted murder, as charged in [count] two of the indictment, and felonious assault, as charged in count three, are allied offenses of similar import committed with a single animus. The court erred by imposing concurrent sentences for the two offenses when it should have directed the prosecutor to elect on which offense conviction would be entered and sentence pronounced. Furthermore, imposition of consecutive sentences violated the constitutional ban against double jeopardy.

Seventh Assignment of Error: The cumulative effect of trial counsel's unprofessional omissions denied appellant his Sixth Amendment and Article I, Section 10 right to the effective assistance of counsel.

Eighth Assignment of Error: Appellant's convictions were against the manifest weight of the evidence.

{¶ 35} Because some of defendant's assignments of error present interrelated issues, we will address some assignments of error together. For further ease of discussion, we will also address some assignments of error out of order. We begin our analysis by discussing defendant's first and second assignments of error together.

{¶ 36} In his first assignment of error, defendant argues that the trial court erred in overruling his motion to suppress identification, asserting that the pretrial identification was impermissibly suggestive and the resulting identifications were unreliable, based upon the method of presenting the photo array. In his second assignment of error, defendant submits that the prosecutor committed misconduct, claiming that the prosecutor used the motion hearing to conduct an improper and suggestive one-on-one showup for those witnesses who had not previously made an out-of-court identification via photo array (Lenora and Frank) and to obtain an initial in-court identification from those witnesses who had previously made identifications via photo array (Alicia and Latayia).

{¶ 37} Appellate review of a motion to suppress presents a mixed question of law and fact. When considering a motion to suppress, the trial court assumes the role of trier of fact and therefore is in the best position to resolve factual questions and evaluate the credibility of witnesses. *State v. Burnside,* 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. As a result, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence. Id. Then, the appellate court must independently determine whether the facts satisfy the applicable legal standard, pursuant to a de novo review and without giving deference to the conclusion of the trial court. Id.

{¶ 38} Prior to suppressing identification testimony, a trial court must engage in a two-step analysis. First, there must be a determination that the identification procedure was so impermissibly suggestive as to give rise to a substantial likelihood of misidentification. *Neil v. Biggers* (1972), 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401. Second, it must be determined that the identification itself was unreliable under the totality of the circumstances. Id. See also *State v. Sherls* (Feb. 22, 2002), 2d Dist. No. 18599, 2002 WL 254144.

{¶ 39} In *Biggers,* the court listed the five factors that must be considered when evaluating reliability under the totality-of-the-circumstances test: (1) the witness's opportunity to view the offender at the time of the crime, (2) the witness's degree of attention at the time of the crime, (3) the accuracy of the witness's prior description of the offender, (4) the witness's level of certainty when identifying the suspect at the confrontation, and (5) the length of time that elapsed between the crime and the confrontation. Id. at 199–200, 93 S.Ct. 375, 34 L.Ed.2d 401.

{¶ 40} Pretrial identifications may be suppressed only if they are both unnecessarily suggestive and unreliable under the totality of the circumstances. *State v. Broomfield* (Oct. 31, 1996), 10th Dist. No. 96APA04–481, 1996 WL 631211. "[R]eliability is the linchpin in determining the admissibility of identifi-

cation testimony." *Manson v. Brathwaite* (1977), 432 U.S. 98, 114, 97 S.Ct. 2243, 53 L.Ed.2d 140. Therefore, even if the identification procedure was suggestive, the subsequent identification is still admissible as long as it is reliable. Id.; *State v. Moody* (1978), 55 Ohio St.2d 64, 67, 9 O.O.3d 71, 377 N.E.2d 1008. "Where a witness has been confronted by a suspect before trial, that witness' identification of the suspect will be suppressed if the confrontation procedure was unnecessarily suggestive of the suspect's guilt and the identification was unreliable under the totality of the circumstances." *State v. Brown* (1988), 38 Ohio St.3d 305, 310, 528 N.E.2d 523, citing *Manson.*

{¶ 41} It is the defendant's burden to prove that the procedures utilized were both suggestive and unnecessary *and* that the testimony was or will be unreliable based upon the totality-of-the-circumstances test. *State v. Taylor*, 3d Dist. No. 1–03–20, 2003-Ohio-7115, 2003 WL 23018574; *State v. Green* (1996), 117 Ohio App.3d 644, 691 N.E.2d 316. If the defendant fails to meet the first part of his burden, the court need not consider the totality-of-the-circumstances test. *Green* at 653, 691 N.E.2d 316. See also *State v. Brown* (Aug. 17, 1994), 1st Dist. No. C–930217, 1994 WL 442119; *State v. Dunham* (May 25, 1983), 1st Dist. No. C–820391, 1983 WL 8858; *Reese v. Fulcomer* (C.A.3, 1991), 946 F.2d 247.

{¶ 42} Defendant argues that the identifications are unnecessarily suggestive and unreliable for several reasons: (1) the background in defendant's photo is a different color than the background used in the filler photos, (2) the filler photos were selected based upon characteristics displayed in defendant's photo, rather than upon a description of the suspect given by the witnesses, (3) the police failed to use the double-blind approach, (4) the police used a "six-pack" photo array, rather than sequential presentation of photos, and (5) the witnesses were exposed to post-event information, such as news reports.

{¶ 43} Defendant further argues that the out-of-court identifications made by Alicia and Latayia should have been suppressed because their memories and their degree of attention were affected by the presence of a weapon, which in turn caused them to be unable to recall many of the specifics of the event, thereby making their identifications unreliable.

{¶ 44} However, to consider these specific challenges, we would have to consider evidence outside of that presented during the suppression hearing, since defendant's arguments rely upon the testimony of his expert witness, who testified at the trial, but not during the suppression hearing. This would require us to rely upon evidence that was not available to the trial court at the time it made its ruling.

{¶ 45} This court has previously held that in reviewing a trial court's ruling on a motion to suppress, an appellate court may consider only evidence that was

presented during the suppression hearing and may not consider evidence presented at trial. In *State v. Mease* (Mar. 14, 1996), 10th Dist. No. 95APA05–614, 1996 WL 112551, we stated that "[o]rdinarily, this court will confine itself to a review of the evidence presented at the suppression hearing when reviewing a trial court's ruling on a motion to suppress." Furthermore, in *State v. Curry* (Aug. 29, 2000), 10th Dist. No. 99AP–1319, 2000 WL 1220160, despite the prosecution's assertion that we could consider the trial testimony to determine whether the motion to suppress should have been granted, we determined that we were confined to a review of the evidence presented at the suppression hearing in reviewing the trial court's ruling.

{¶ 46} Although some federal courts, including the Sixth Circuit, have considered evidence that was submitted during trial, numerous Ohio appellate courts have, like us, based their review only upon evidence presented at the suppression hearing. See *State v. Wright*, 7th Dist. No. 03 MA 112, 2004-Ohio-6802, 2004 WL 2913909; *State v. Weese*, 9th Dist. No. 20769, 2002-Ohio-3750, 2002 WL 1627055; *State v. Tapke*, 1st Dist. No. C–060494, 2007-Ohio-5124, 2007 WL 2812310; *State v. VanNoy*, 188 Ohio App.3d 89, 2010-Ohio-2845, 934 N.E.2d 413. See also *State v. Kinley* (1995), 72 Ohio St.3d 491, 496, 651 N.E.2d 419, fn. 1 (noting that the trial court had denied the motion to suppress based upon evidence presented at the suppression hearing, rather than evidence presented at trial, the court found that the trial testimony had no bearing on the issue whether the trial court had abused its discretion in denying the motion to suppress).

█ {¶ 47} Even if we were to consider Dr. Fulero's trial testimony in reviewing the propriety of the court's pretrial ruling, it is our determination that the trial court did not err in refusing to exclude the identification, because the photo arrays and the procedures used in generating and showing those arrays were not impermissibly suggestive.

█ {¶ 48} First, "[a] photo array is not unfairly suggestive due solely to different backgrounds." *State v. Parrish*, 2d Dist. No. 21091, 2006-Ohio-2677, 2006 WL 1461159, ¶ 36, citing *State v. Nelson*, 8th Dist. No. 81558, 2003-Ohio-3219, 2003 WL 21419298; see also *State v. Warren* (Oct. 9, 1986), 10th Dist. No. 86AP–127, 1986 WL 11296, citing *State v. Dorsey* (Dec. 1, 1983), 10th Dist. No. 83AP–273, 1983 WL 3798 (photo array is not unduly suggestive when a defendant's photo was the only one with a certain color background); *State v. Browner* (May 31, 2001), 4th Dist. No. 99CA2688, 2001 WL 812805.

{¶ 49} Second, the fact that the photo arrays were created by using filler photos of men who displayed features similar to those of the suspect, rather than by using filler photos of men who matched the suspect's description, does not make the procedure impermissibly suggestive. A photo array that is " 'created

by police prior to the victim giving a description of the suspect * * * is not unreasonably suggestive, as long as the array contains individuals with features similar to the suspect.'" *State v. Hickman*, 5th Dist. No. 09–CA–15, 2009-Ohio-4911, 2009 WL 2986239, ¶ 10, quoting *State v. Jones*, 8th Dist. No. 85025, 2005-Ohio-2620, 2005 WL 1245625, ¶ 15; *State v. McCroskey*, 5th Dist. No. 2007CA00089, 2008-Ohio-2534, 2008 WL 2571857, ¶ 29.

{¶ 50} Here, the record indicates that police initially had only a general description of the suspect and the suspect's vehicle. Soon thereafter, an unidentified tipster provided police with the name of the shooter. As a result, defendant's driver's license photo was placed into an array, and he was positively identified by Alicia the day after the shooting. A second array, using a more recent photo, was later shown to two additional witnesses. The photos in both arrays are similar in nature to one another. Both contain photos of men of the same race with similar skin tone who appear to be in their 30's or 40's with a mustache and a bald or shaved head. We see nothing suggestive here. Furthermore, as was recently noted by the Fifth District, a photo array is generally based upon identification of a specific person or upon a specific physical description. *State v. Patterson*, 5th Dist. No. 2009CA00142, 2010-Ohio-2988, 2010 WL 2595181, ¶ 63.

{¶ 51} Third, failure to present the photo array using the double-blind and sequential methods does not make the identification procedure unduly suggestive. When a police agency uses the double-blind method, a photo array is shown by a neutral officer without knowledge of who the targeted suspect is so that the officer cannot subconsciously or unintentionally communicate to the witness which photo should be selected. The sequential-presentation method uses single photos of the suspect and other individuals, rather than the traditional "six-pack" array.

{¶ 52} Here, the double-blind method was not used, as the photo array was shown by Detective Glasure, who had knowledge of the targeted suspect. However, there is no evidence in the record to suggest that Detective Glasure influenced the witnesses in any way or indicated, intentionally or unintentionally, which photo they should select. There is absolutely no evidence that Detective Glasure said or did anything that would have suggested that the witnesses should choose defendant from the photo arrays. Additionally, Detective Glasure informed the witnesses that they should not feel obligated to pick anyone out of the array.

{¶ 53} Furthermore, at least one other state court has found that failure to use the double-blind and sequential methods is not automatically unnecessarily suggestive. "To the extent that the trial court's decision implies that the simultaneous display of photographs in an array by a police officer with specific knowledge of the case is *per se* unnecessarily suggestive, it is incorrect." *State v.*

*Marquez* (2009), 291 Conn. 122, 139, 967 A.2d 56. "Due process does not require the suppression of a photographic identification that is not the product of a double-blind, sequential procedure." *State v. Smith,* 107 Conn.App. 666, 674, 946 A.2d 319, citing *State v. Nunez,* 93 Conn.App. 818, 828–832, 890 A.2d 636.

{¶ 54} Additionally, in *United States v. Lawrence* (C.A.3, 2003), 349 F.3d 109, 115, the Third Circuit opined that the sequential-presentation method also has pitfalls. The Lawrence court found that showing all of the photographs at once using the "six pack" method could also be a very fair way to proceed, since if the police show each photograph separately, an issue would likely arise as to the defendant's order in the sequential array. If his photo was first, a defendant might argue that showing his photo first was unfair. Similarly, a defendant might also argue that it is unfair to show his photo last, after the witness has been unable to identify anyone else before him.

{¶ 55} Fourth, witness exposure to photographs of the suspect shown on television prior to identification does not require suppression of the identification. Defendant argues that because Latayia made her identification after she saw defendant's photo on television, her identification should be suppressed. However, in *State v. Ware,* 10th Dist. No. 00AP–43, 2004-Ohio-6984, 2004 WL 2944165, we determined that if no state action was involved in any pretrial exposure to a television newscast showing the defendant's picture, any alleged suggestiveness goes to the weight and credibility of the witness's testimony, rather than to admissibility. Additionally, in *State v. Ward* (Feb. 22, 2001), 10th Dist. No. 00AP–241, 2001 WL 138122, we held that if the police did not manipulate the media, exposure to media reports was not a sufficient ground upon which to suppress identification.

{¶ 56} Based upon this discussion, we find that the trial court's decision refusing to suppress the identifications was not improper, as there is nothing about the identification procedure that was suggestive. As a result, it is unnecessary for us to discuss whether the identifications were unreliable under the totality of the circumstances. Accordingly, we overrule defendant's first assignment of error.

{¶ 57} In his second assignment of error, defendant again argues that the identification of defendant was improper and suggestive, this time in the context of the suppression hearing. First, defendant contends that because neither Lenora nor Frank had previously identified him in a photo array, their in-court identifications essentially constituted a one-on-one show up, which is inherently suggestive, thereby guaranteeing a positive in-court identification at the trial and tainting the reliability of their trial identifications. Second, defendant asserts that the in-court identifications made by Latayia and Alicia were also suggestive, in that the prosecution's line of questioning suggested that the

shooter was in the courtroom. Defendant submits that the entire process was suggestive, since it is obvious that the suspect is the person seated at the table next to defense counsel, and therefore it constituted prosecutorial misconduct. We disagree.

{¶ 58} As stated above, when determining whether an identification is admissible, a two-step process is used. The first step is to determine whether the identification procedure was impermissibly suggestive. *Neil*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401. The second step is to determine whether the identification was unreliable under the totality of the circumstances. Id. An in-court identification typically occurs under circumstances that suggest the identity of the defendant. *State v. Johnson*, 163 Ohio App.3d 132, 2005-Ohio-4243, 836 N.E.2d 1243, ¶ 55. As a result, the admissibility of such an identification is subject to the totality-of-the-circumstances analysis. See *United States v. Hill* (C.A.6, 1992), 967 F.2d 226. Therefore, if the identification procedures were impermissibly suggestive, the court must then determine whether the testimony and identification were nevertheless reliable under the totality of the circum-stances. If the totality of the circumstances demonstrates that the identification was otherwise reliable, the identification is admissible, and there is no due process violation. Id. at 230.

{¶ 59} In *Johnson*, we addressed whether a pretrial, in-court identification is unreliable and taints a later identification during trial. In that case, a witness who was unable to identify the suspect from a photo array made an in-court identification of the suspect during a juvenile bindover proceeding. The juvenile was bound over to common pleas court, where the trial court suppressed the identification. The prosecution appealed, and we reversed the trial court on the identification issue, finding that the identification was sufficiently reliable to permit its admission into evidence.

{¶ 60} In *Johnson*, we cited several factors that contributed to our determina-tion that the identification was not unreliable. We found the following: there were no suggestive out-of-court procedures that could have invalidated the in-court identification; the witness made her identification in court and under oath and was subject to cross-examination; the witness testified that she had observed the suspect for over a minute and during much of that time, she was standing within a few feet of him and staring at his eyes; and the witness was confident in her identification and the testimony of other witnesses revealed her certainty in her identification. Furthermore, we determined that the witness's understanding of the court process and proceeding did not render her identification unreliable.

{¶ 61} Similarly, in the instant case, all four witnesses made their identifica-tions under oath and were subject to cross-examination, at which time defendant could have easily raised the issue of the prosecutor's alleged implication that the

shooter was in the courtroom. However, he did not. Additionally, all of the witnesses expressed confidence in their identifications. Furthermore, the fact that the witnesses probably understood that the defendant would likely be present in the courtroom during the proceeding does not render the identifications unreliable.

{¶ 62} In analyzing the *Biggers* reliability factors, we find the identifications by all four witnesses were reliable.

{¶ 63} Regarding Alicia and Latayia, both women had a significant opportunity to observe defendant at close range during the time they were all at the bar. Latayia was within a few feet of him when she served him drinks on more than one occasion and was only feet away when the confrontation occurred. Alicia greeted him upon her initial arrival and was also only a few feet away when the confrontation occurred. Their attention was obviously directed to defendant during his confrontation with Eugene. In addition, the bar was well lit on the afternoon of the shooting. While it appears that neither woman provided much of a description of the suspect, and while the in-court identification admittedly occurred approximately one and a half years after the event, both women were very certain in their identifications and both had previously identified him from a photo array within a few weeks of the shooting. Furthermore, their identifications were corroborated by additional witnesses.

{¶ 64} As for Lenora and Frank, Lenora was seated at the bar only a few seats away when the confrontation occurred. She saw defendant with a gun, which immediately drew her attention to him. Lenora witnessed defendant shoot Eugene and Alicia and later drive away. She did not hesitate in identifying him. Although she did see his photo on television, such exposure affects the weight of her identification, not the admissibility of her identification. Frank, on the other hand, had no media exposure and had known defendant for some time. He saw defendant outside in broad daylight. He testified that he watched defendant get into his truck, exit the parking lot, and drive down St. Clair with his arms raised in the air, staring back at Frank. He too seemed confident in his identification. Although their identifications occurred almost one and a half years after the event, again, the identifications were corroborated by additional witnesses.

{¶ 65} Based upon the foregoing, we find that the identifications made at the suppression hearing were not unreliable and did not cause the witnesses' identifications at trial to be inadmissible. These identifications did not affect the fairness of defendant's trial, and defendant has not demonstrated how they constitute prosecutorial misconduct. We further find it to be significant that although defense counsel objected to the suppression-hearing identifications, he did not object when the witnesses subsequently identified defendant at trial. Furthermore, two additional witnesses, Cornell and Toni, later identified defen-

dant for the first time at trial and defendant has not challenged their identifications.

{¶ 66} Accordingly, we overrule defendant's second assignment of error.

 {¶ 67} In his fourth assignment of error, defendant submits that his counsel's failure to address his plea of not guilty by reason of insanity or to request a jury instruction on that affirmative defense constituted a denial of his due process rights. Defendant speculates that his plea of not guilty by reason of insanity ("NGRI") was "forgotten" in the months after it was entered and as a result, it was never withdrawn. Defendant, relying on *State v. Cihonski*, 178 Ohio App.3d 713, 2008-Ohio-5191, 900 N.E.2d 212, argues that this failure to withdraw the plea or to address the issue constitutes structural error.

{¶ 68} The state disputes defendant's inference that once an NGRI plea has been filed, the trial court must instruct the jury on NGRI, whether or not any evidence has been presented relating to the NGRI plea and whether or not such an instruction was requested. The state further disputes defendant's implication that due process requires that an NGRI plea, once entered, must either be pursued as a defense or formally withdrawn, even if there is no evidence in the record to support such a defense.

{¶ 69} The definition for the legal-insanity standard is set forth in R.C. 2901.01(A)(14). A person is "not guilty by reason of insanity" if the person proves that at the time of the commission of the offense, he did not know, as a result of a severe mental disease or defect, the wrongfulness of his acts. Notably, the standard for competency is different, in that it relates to the defendant's present mental condition and his ability to understand the nature of the proceedings against him and to assist his counsel in his defense. See R.C. 2945.37.

 {¶ 70} NGRI is an affirmative defense that must be proved by the defendant by a preponderance of the evidence. *State v. Jennings*, 10th Dist. No. 05AP–1051, 2006-Ohio-3704, 2006 WL 2022235, ¶ 10; *State v. Taylor*, 98 Ohio St.3d 27, 2002-Ohio-7017, 781 N.E.2d 72, ¶ 64; R.C. 2901.05(A). With an insanity defense, the defendant must persuade the trier of fact that at the time of the commission of the offense, he did not know the wrongfulness of his acts, as a result of a severe mental disease or defect. *Jennings* at ¶ 10. The proper standard for determining whether a defendant has successfully demonstrated this defense and thus is entitled to an NGRI instruction is whether he has " ' "introduced sufficient evidence, which, if believed, would raise a question in the minds of reasonable men concerning the existence of such issue." ' " *State v. Thomas*, 10th Dist. No. 06AP–675, 2007-Ohio-1171, 2007 WL 778606, ¶ 11, quoting *State v. Tantarelli* (May 23, 1995), 10th Dist. No. 94APA11–1618, 1995 WL 318730,

quoting *State v. Melchior* (1978), 56 Ohio St.2d 15, 20–21, 10 O.O.3d 8, 381 N.E.2d 195. A trial court does not err in refusing to include an instruction to the jury on the defense of insanity where the evidence presented does not warrant such an instruction. *State v. Dunn* (June 28, 1996), 3d Dist. No. 1–95–74, 1996 WL 379651.

{¶ 71} In *Cihonski,* 178 Ohio App.3d 713, 2008-Ohio-5191, 900 N.E.2d 212, the Third District found structural error where the trial court failed to notify the jury of the defendant's NGRI plea and failed to give an NGRI instruction, thereby violating his right to a trial by jury and thus warranting reversal of the conviction. Defendant asserts that the present case is factually similar to *Cihonski* and that structural error occurred here too. However, we disagree, as we find this case to be distinguishable from *Cihonski.*

{¶ 72} In *Cihonski,* the defendant admitted to the conduct with which he was charged, but claimed that his actions were not voluntary and instead were the product of a "reflex action." Cihonski also testified that he had left a psychiatric hospital a few days prior to the incident.

{¶ 73} Based upon this testimony, the *Cihonski* court seemed to conclude that Cihonski was advancing a defense of legal insanity, that it was his wish to advance such a defense, and that in failing to comply with the wishes of his client by failing to notify the jury of the NGRI plea or to request an NGRI instruction, Cihonski's counsel had caused structural error to occur, since the right of the accused to choose the plea to be entered is a substantial right. See generally *State v. Tenace* (1997), 121 Ohio App.3d 702, 700 N.E.2d 899. The Third District went on to find that "no evidence exists in the record that the jury even considered Cihonski's defense." *Cihonski* at ¶ 23.

{¶ 74} The instant case is dissimilar to *Cihonski* in that defendant never presented an NGRI defense. Defendant did not present one shred of evidence to demonstrate, or even suggest, that he did not know the wrongfulness of his acts, nor did he ever indicate that he wished to present an NGRI defense. Similarly, he did not request an NGRI jury instruction. Instead, throughout the entire trial proceedings, his defense was clearly one of misidentification. His entire defense was not that he had committed the shooting as a result of a severe mental disease or defect, but that he was simply not the shooter and that the witnesses had gotten it wrong. An NGRI defense was utterly inconsistent with the misidentification theory that was presented at trial and nothing in the record indicates that he ever even attempted to present an NGRI defense or that he wished to present such a defense. In fact, the record supports the belief that defendant was completely on board with the misidentification defense.

{¶ 75} For example, within a few weeks of Dr. Haskins's alleged preparation of defendant's psychological evaluation report,[1] counsel for defendant filed a motion to suppress the identification on July 23, 2008. Notably, in a letter dated July 7, 2008, and postmarked July 11, 2008, defendant informed the judge, "[f]rom the beginning I've repeatedly proclaimed my innocence and requested to see the tampered video tape and all other alleged evidence." Additionally, at an October 21, 2008 hearing at which defendant addressed his concerns regarding his representation, defendant indicated that he had recently resolved most of his issues and never indicated any difficulties with counsel regarding a desire to pursue an NGRI defense. Furthermore, the court subsequently authorized funds for defendant to retain an expert on eyewitness identification.

{¶ 76} Based upon this analysis, we find *Cihonski* to be inapposite to the case at bar, and as a result, *Cihonski*'s structural-error analysis is not applicable here. In addition, defendant was not denied his right to due process or a trial by jury, in that the evidence clearly does not support such an NGRI defense and no such instruction would have been warranted. Accordingly, we overrule defendant's fourth assignment of error.

{¶ 77} In his third and seventh assignments of error, defendant alleges that he was denied the right to the effective assistance of counsel. Specifically, in his third assignment of error, defendant submits that his counsel failed to conduct a meaningful inquiry during voir dire and failed to excuse a clearly objectionable juror. In his seventh assignment of error, defendant contends that the cumulative effect of his counsel's unprofessional errors and omissions constituted ineffective assistance of counsel. The cumulative errors asserted are (1) counsel failed to address the NGRI plea filed by previous counsel,[2] (2) counsel failed to file a notice of alibi, (3) counsel failed to move for a Crim.R. 29 acquittal at the close of the state's case and/or at the close of evidence, and (4) counsel made an "inartful" argument regarding defendant's proposed merger of the attempted-murder and felonious-assault offenses for sentencing purposes.

{¶ 78} In Ohio, a properly licensed attorney is presumed competent. *Vaughn v. Maxwell* (1965), 2 Ohio St.2d 299, 301, 31 O.O.2d 567, 209 N.E.2d 164. Therefore, the burden of showing ineffective assistance of counsel is on the party asserting it. *State v. Smith* (1985), 17 Ohio St.3d 98, 100, 17 OBR 219, 477 N.E.2d 1128. Trial counsel is entitled to a strong presumption that all decisions

---

1. While the record does not contain the actual report itself, it does contain an invoice from Dr. Haskins reflecting that she had examined defendant on May 9 and June 2, 2008, and prepared a report on June 16, 2008.

2. See analysis regarding defendant's fourth assignment of error immediately preceding this discussion.

fall within the wide range of reasonable professional assistance. *State v. Sallie* (1998), 81 Ohio St.3d 673, 675, 693 N.E.2d 267. Additionally, in fairly assessing counsel's performance, there is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, ¶ 101.

 {¶ 79} Trial strategy and even debatable trial tactics do not establish ineffective assistance of counsel. Id. A reviewing court must be "highly deferential to counsel's performance and will not second-guess trial strategy decisions." *State v. Tibbetts* (2001), 92 Ohio St.3d 146, 166–67, 749 N.E.2d 226. Strategic choices made after substantial investigation "will seldom if ever" be found wanting. *Strickland v. Washington* (1984), 466 U.S. 668, 681, 104 S.Ct. 2052, 80 L.Ed.2d 674. "Because advocacy is an art and not a science, and because the adversary system requires deference to counsel's informed decisions, strategic choices must be respected in these circumstances if they are based on professional judgment." Id.

{¶ 80} "[T]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial court cannot be relied on as having produced a just result." Id. at 686, 104 S.Ct. 2052, 80 L.Ed.2d 674. In order to succeed on a claim of ineffective assistance of counsel, appellant must satisfy a two-prong test. First, he must demonstrate that his trial counsel's performance was deficient. Id. at 687. This requires a showing that his counsel committed errors that were "so serious that counsel was not functioning as the 'counsel' guaranteed * * * by the Sixth Amendment." Id. If he can show deficient performance, he must next demonstrate that he was prejudiced by the deficient performance. Id. To show prejudice, he must establish that there is a reasonable probability that but for his counsel's unprofessional errors, the result of the trial would have been different. A reasonable probability is one sufficient to erode confidence in the outcome. Id. at 694.

{¶ 81} Defendant asserts that his counsel "told dubious anecdotes" during voir dire, rather than conducting a searching inquiry during this very serious case. He complains that his counsel allegedly associated him with the infamous O.J. Simpson and his subsequently disbarred attorney, F. Lee Bailey, using one of his anecdotes. As a result, he submits that counsel's performance was deficient. We disagree.

 {¶ 82} Trial counsel is entitled to exercise wide discretion in formulating voir dire questions. See *State v. Group*, 98 Ohio St.3d 248, 2002-Ohio-7247, 781 N.E.2d 980, ¶ 139; *State v. Murphy* (2001), 91 Ohio St.3d 516, 539, 747 N.E.2d 765; *State v. Bradley* (1989), 42 Ohio St.3d 136, 143–144, 538 N.E.2d 373. The

Ohio Supreme Court has repeatedly declined to impose a "hindsight view" as to how counsel might have examined the jury differently on voir dire. *State v. Mundt*, 115 Ohio St.3d 22, 2007-Ohio-4836, 873 N.E.2d 828, ¶ 63; *State v. Mason* (1998), 82 Ohio St.3d 144, 157, 694 N.E.2d 932. Here, it is apparent that counsel was attempting to explain, through the use of anecdotes, the presumption of innocence and the idea that first impressions are often wrong because things are frequently not as they appear to be on the surface. Given that defense counsel's trial strategy was one of mistaken identity, such an approach was not deficient.

{¶ 83} Defendant also asserts that his counsel failed to conduct a searching voir dire and failed to sufficiently question various jurors who had been victimized by crime. However, " '[f]ew decisions at trial are as subjective or prone to individual attorney strategy as juror *voir dire,* where decisions are often made on the basis of intangible factors.' " *Mundt* at ¶ 64, quoting *Miller v. Francis* (C.A.6, 2001), 269 F.3d 609, 620. As a result, "counsel is in the best position to determine whether any potential juror should be questioned and to what extent." *Murphy* at 539, 747 N.E.2d 765; see also *Bradley* at 143, 538 N.E.2d 373.

{¶ 84} Furthermore, posing only a few questions, or even no questions at all, to a prospective juror could potentially be the most advantageous tactic for defense counsel in some situations. " '[Q]uestioning by other parties may convince counsel that the juror would be favorable for the defense, and that further questions might only antagonize the juror or give the prosecution a reason to use a peremptory challenge or even grounds for a challenge for cause.' " *Mundt,* 115 Ohio St.3d 22, 2007-Ohio-4836, 873 N.E.2d 828, at ¶ 65, quoting *People v. Freeman* (1994), 8 Cal.4th 450, 485, 34 Cal.Rptr.2d 558, 882 P.2d 249. It is not necessary for counsel to repeat questions about topics that have already been covered by opposing counsel or the judge. *State v. Coleman* (1999), 85 Ohio St.3d 129, 135, 707 N.E.2d 476.

{¶ 85} Defendant challenges his counsel's alleged failure to question various jurors regarding potential bias that may have arisen as a result of having been the victim of a crime. Defendant also challenges his counsel's failure to remove Juror Andrew Nguyen for cause, pursuant to Crim.R. 24(B). We find defendant's assertion that counsel should have asked more questions and excused plainly objectionable jurors to be without merit.

{¶ 86} As noted above, voir dire is a very subjective process in which counsel is entitled to wide discretion in formulating questions, and the Ohio Supreme Court has repeatedly declined to second-guess how counsel could have conducted voir dire differently. Furthermore, trial counsel is in a better position to determine which members of the venire warrant an in-depth examination. *State v. Phillips*

(1995), 74 Ohio St.3d 72, 85–86, 656 N.E.2d 643; *State v. McGuire* (1997), 80 Ohio St.3d 390, 398, 686 N.E.2d 1112.

{¶ 87} Here, two of the jurors about whom defendant complains (jurors 3 and 6) were never sworn in as jurors, due to the exercise of peremptory challenges. Therefore, voir dire of these potential jurors could not have affected the verdict, and prejudice cannot be established. See *Coleman* at 136, 707 N.E.2d 476.

{¶ 88} Regarding jurors 1, 4, 9, and 12, all of whom were the victims of (or had a family member who was a victim of) a crime such as robbery or burglary, defense counsel could have reasonably determined that it was unnecessary to ask additional questions, as the prosecutor's questioning had already established that these prospective jurors could be fair and impartial. Additionally, regarding prospective juror 8's involvement with the neighborhood block watch, it would have been reasonable for defense counsel to conclude that it was unnecessary to probe further into this topic, since the nature of the crimes at hand bore little direct relationship to the block watch.

{¶ 89} Next, as to Juror Nguyen, we find that his responses did not plainly form the basis for a challenge for cause, and therefore counsel was not ineffective in failing to raise such a challenge.

{¶ 90} Crim.R. 24(C) provides as follows:

(C) Challenge for cause.

A person called as a juror may be challenged for the following causes:

\* \* \*

(9) That the juror is possessed of a state of mind evincing enmity or bias toward the defendant or the state; \* \* \*

\* \* \*

(14) That the juror is otherwise unsuitable for any other cause to serve as a juror.

{¶ 91} When the trial judge inquired as to whether there was "anything about the information that I read that would make it difficult for someone to be a fair and impartial juror in this case," Juror Nguyen indicated, "I do have some knowledge so I wouldn't be able to serve as a juror." There was no further inquiry at that time, but later, after Juror Nguyen was moved up from prospective juror 16 to prospective juror 3, additional inquiry revealed that it might be difficult for him to sit as a juror because he had witnessed a family member die from a gunshot wound and that that experience would make it hard for him to hear the evidence and sit as a juror. He agreed with the trial judge's assessment that his experience might make it "distracting" for him to listen to the evidence.

However, he informed the trial judge that he had no concerns about anything else that had been discussed that might affect his ability to be fair and impartial.

{¶ 92} Upon further inquiry conducted by defense counsel, Juror Nguyen indicated that he was comfortable with the concepts of the presumption of innocence and proof beyond a reasonable doubt. He also indicated that he had nothing to add to the topics that had previously been discussed with the other jurors.

{¶ 93} Following this inquiry, the trial judge asked defense counsel if he wished to raise a challenge for cause, to which counsel replied, "No. My client would like to keep him." The trial judge then asked additional questions of Juror Nguyen outside the presence of the other jurors and in the presence of counsel. Juror Nguyen clarified that he had not witnessed the actual shooting of his uncle, but that he was present when his uncle died as a result of a gunshot wound. Upon further inquiry, Juror Nguyen assured the court that even if the testimony was distasteful or uncomfortable, he would be able to listen to and evaluate the evidence, be fair and impartial to both sides, and sign his name to a verdict form for either guilty or not guilty. Juror Nguyen also assured defense counsel that he still would be able to think independently in this matter, despite his prior experience.

{¶ 94} Based upon these exchanges, Juror Nguyen was not subject to removal for cause pursuant to Crim.R. 24(C). See *State v. Morris*, 10th Dist. No. 05AP–1139, 2009-Ohio-2396, 2009 WL 1444089, ¶ 20. As for defense counsel's decision to keep Juror Nguyen on the jury and to use a peremptory challenge for a different juror, such a decision was not unreasonable, given Juror Nguyen's testimony that he could be fair and impartial to both sides and given defendant's desire to keep him. Defendant has not demonstrated that Juror Nguyen was actually biased against him. See *Mundt*, 115 Ohio St.3d 22, 2007-Ohio-4836, 873 N.E.2d 828, at ¶ 67; *Miller*, 269 F.3d 609, at 616; *Hughes v. United States* (C.A.6, 2001), 258 F.3d 453, 458. The use of peremptory challenges is "inherently subjective and intuitive" and rarely does the record reveal "reversible incompetence in this process." *Mundt* at ¶ 83, quoting *People v. Montiel* (1993), 5 Cal.4th 877, 911, 21 Cal.Rptr.2d 705, 855 P.2d 1277. Furthermore, the selection of jurors falls within trial strategy. So long as a juror indicates that he can be fair and impartial, counsel is not ineffective in declining to exercise a peremptory challenge. *State v. Valle* (Mar. 13, 2000), 5th Dist. No. 1999CA00079, 2000 WL 330054; *Lakewood v. Town* (1995), 106 Ohio App.3d 521, 526, 666 N.E.2d 599, citing *State v. Buchanan* (Feb. 14, 1992), 3d Dist. No. 14–91–14, 1992 WL 29247; *State v. Johnson* (May 1, 2000), 12th Dist. No. CA99–06–061, 2000 WL 525671.

{¶ 95} Therefore, we find no merit in defendant's argument that his counsel was ineffective in the jury-selection process. We next address defendant's

assertion that he was denied the effective assistance of counsel as a result of his counsel's cumulative errors.

{¶ 96} Defendant asserts that his counsel was ineffective in failing to file a notice of alibi pursuant to Crim.R. 12.1. However, this assertion is meritless, because the trial court readily agreed to allow defendant to present a notice of alibi, so long as counsel provided the prosecution with the specific alibi information. The prosecution did not object to this. Therefore, counsel's failure to timely file a notice of alibi did not prevent him from presenting an alibi defense. In addition, several appellate courts have held that if a defendant is allowed to present alibi testimony, the defendant cannot show prejudice as a result of counsel's failure to file a timely notice of alibi. *State v. Lette*, 11th Dist. No. 2007–L–213, 2008-Ohio-5942, 2008 WL 4901732, ¶ 27; *State v. Grant*, 12th Dist. No. CA2003–05–114, 2004-Ohio-2810, 2004 WL 1196184, ¶ 27; *State v. Moman*, 7th Dist. No. 02CO52, 2004-Ohio-1387, 2004 WL 549807, ¶ 54; *State v. McDuffie*, 3d Dist. No. 9–2000–92, 2001-Ohio-2217, 2001 WL 542114.

{¶ 97} To the extent that defendant asserts that his counsel was ineffective in failing to investigate and develop an alibi defense, this information is not contained in the record. What is in the record is an indication from defendant's counsel that, following consultation with counsel, defendant decided not to testify and not to call a couple of witnesses. Defendant may have very well decided to abandon the alibi defense.

{¶ 98} Defendant also takes issue with defense counsel's failure to make a Crim.R. 29 motion challenging the sufficiency of the evidence. However, as will be demonstrated in more detail in our analysis of defendant's fifth and eighth assignments of error, there were multiple witnesses who testified that defendant shot two people, as well as another witness who saw defendant driving away from the scene. Counsel clearly would not have been successful in advancing a Crim.R. 29 motion, and therefore defendant was not prejudiced by counsel's failure to make such a motion.

{¶ 99} Next, defendant asserts that counsel was ineffective because he neglected to acknowledge the NGRI plea or to request an NGRI instruction pursuant to the precedent set forth under *Cihonski*, 178 Ohio App.3d 713, 2008-Ohio-5191, 900 N.E.2d 212. Because we have already determined that *Cihonski* is distinguishable from the instant case, and because defendant never presented any evidence to even suggest that he was pursuing an NGRI defense, and instead argued throughout the trial that this was simply a case of mistaken identity, we find defendant's counsel was not ineffective in failing to inform the jury of the NGRI plea or in failing to request an NGRI instruction. Given that counsel pursued the mistaken-identity defense through the use of an expert witness, and

given that there was no evidence presented to persuade the jurors that at the time of the offense, defendant did not know the wrongfulness of his actions, any request for an NGRI jury instruction would have been denied. Thus, defendant was not prejudiced by the lack of a request for an NGRI instruction.

{¶ 100} Finally, defendant submits that his trial counsel was ineffective in making his "inartful" argument asserting that the attempted-murder and felonious-assault offenses should be merged for purposes of sentencing. However, counsel acknowledged that at the time of the sentencing, there was a split of authority as to whether the two offenses were allied offenses of similar import. Additionally, he asked the court to find the two charges to be allied offenses of similar import and thereby preserved the issue for appeal. We fail to see how he was ineffective in this regard.

{¶ 101} Accordingly, we find that defendant's counsel was not ineffective as asserted in his third and seventh assignments of error, and therefore we overrule both assignments of error.

{¶ 102} In his fifth and eighth assignments of error, defendant argues that his convictions are not supported by sufficient evidence and are against the manifest weight of the evidence.

{¶ 103} Sufficiency of the evidence is a legal standard that tests whether the evidence introduced at trial is legally sufficient to support a verdict. *State v. Thompkins* (1997), 78 Ohio St.3d 380, 386, 678 N.E.2d 541. We examine the evidence in the light most favorable to the state and conclude whether any rational trier of fact could have found that the state proved beyond a reasonable doubt all of the essential elements of the crime. *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus; *State v. Yarbrough,* 95 Ohio St.3d 227, 2002-Ohio-2126, 767 N.E.2d 216, ¶ 78; *State v. Williams,* 99 Ohio St.3d 493, 2003-Ohio-4396, 794 N.E.2d 27.

{¶ 104} In determining whether a conviction is based on sufficient evidence, an appellate court does not assess whether the evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction. See *Jenks,* paragraph two of the syllabus; *Thompkins,* 78 Ohio St.3d at 390, 678 N.E.2d 541 (Cook, J., concurring); *Yarbrough* at ¶ 79 (noting that courts do not evaluate witness credibility when reviewing a sufficiency-of-the-evidence claim). We will not disturb the verdict unless we determine that reasonable minds could not arrive at the conclusion reached by the trier of fact. *State v. Treesh* (2001), 90 Ohio St.3d 460, 484, 739 N.E.2d 749; *Jenks* at 273, 574 N.E.2d 492. Whether the evidence is legally sufficient to sustain a verdict is a question of law. *Thompkins* at 386, 678 N.E.2d 541.

{¶ 105} While sufficiency of the evidence is a test of adequacy regarding whether the evidence is legally sufficient to support the verdict as a matter of law, the criminal manifest-weight-of-the-evidence standard addresses the evidence's effect of inducing belief. *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25, citing *Thompkins* at 386, 678 N.E.2d 541. Under the manifest-weight-of-the-evidence standard, a reviewing court must ask the following question: whose evidence is more persuasive, the state's or the defendant's? Id. at ¶ 25. Although there may be legally sufficient evidence to support a judgment, it may nevertheless be against the manifest weight of the evidence. *Thompkins* at 387, 678 N.E.2d 541; see also *State v. Robinson* (1955), 162 Ohio St. 486, 55 O.O. 388, 124 N.E.2d 148 (although there is sufficient evidence to sustain a guilty verdict, a court of appeals has the authority to determine that such a verdict is against the weight of the evidence); *State v. Johnson* (2000), 88 Ohio St.3d 95, 723 N.E.2d 1054.

{¶ 106} "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." *Wilson* at ¶ 25, quoting *Thompkins* at 387, 678 N.E.2d 541. In determining whether a conviction is against the manifest weight of the evidence, the appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses and determine whether, in resolving any conflicts in the evidence, the jury clearly lost its way and thereby created such a manifest miscarriage of justice that the conviction must be reversed and a new trial must be ordered. *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541, citing *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 20 OBR 215, 485 N.E.2d 717.

{¶ 107} A conviction should be reversed on manifest-weight grounds only in the most " 'exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins* at 387, 678 N.E.2d 541, quoting *Martin* at 175, 20 OBR 215, 485 N.E.2d 717. Moreover, " 'it is inappropriate for a reviewing court to interfere with factual findings of the trier of fact * * * unless the reviewing court finds that a reasonable juror could not find the testimony of the witness to be credible.' " *State v. Brown*, 10th Dist. No. 02AP–11, 2002-Ohio-5345, 2002 WL 31194302, ¶ 10, quoting *State v. Long* (Feb. 6, 1997), 10th Dist. No. 96APA04–511, 1997 WL 52911.

{¶ 108} Defendant challenges his identification as the shooter, claiming that the digital surveillance images portray only washed-out or faded images, which make it impossible to identify the facial features of the shooter. He also points out the lack of any physical evidence linking him to the crime. In addition,

defendant challenges the accuracy and credibility of the state's witnesses by pointing to their opportunity to view the event (or lack thereof) and asserting that most of the witnesses were focused on the gun, rather than on the person holding the weapon. Citing the testimony of his expert witness, defendant argues that the presence of the weapon, as well as the stress of the circumstances, decreases the accuracy of this eyewitness testimony.

{¶ 109} As stated above, in conducting a review for sufficiency of the evidence, an appellate court does not assess the credibility of the witnesses, but instead determines whether the evidence, if believed, supports a conviction. Here, we find that it does.

{¶ 110} There were five witnesses who testified that defendant was the shooter. Two of those witnesses were familiar with defendant and had seen defendant on prior occasions. Three of the witnesses viewed a photo array and identified defendant as the shooter from the photo arrays. An additional witness (Frank) testified that he had been acquainted with defendant for many years and that he saw defendant driving away from the scene. A vehicle matching the description given by witnesses as the vehicle used by the suspect to drive away from the scene was located at the address listed on defendant's driver's license. Although motive is not an element of the offenses charged here, there was testimony regarding a financial motive for the shooting, thereby possibly further explaining the reason for the shootings.

{¶ 111} Accordingly, we find that the evidence, if believed, is sufficient to support defendant's convictions for murder, attempted murder, felonious assault, and carrying a concealed weapon. Therefore, we overrule defendant's fifth assignment of error.

{¶ 112} We further find defendant's challenge regarding the manifest weight of the evidence in his eighth assignment of error to be without merit.

{¶ 113} Although defendant asserts that the state's identification witnesses were not credible and/or did not make reliable identifications, we note that a decision on the credibility of the witnesses made by a fact-finder, such as a jury, is given great deference by a reviewing court. *State v. Covington*, 10th Dist. No. 02AP–245, 2002-Ohio-7037, 2002 WL 31839206, ¶ 28. Even in light of the identification testimony from defendant's expert, in which he opined that eyewitness identification was often unreliable and that stressful circumstances and the presence of a weapon could decrease the witnesses' ability to recall the event, the jury could have legitimately concluded that each witness had an adequate opportunity to view defendant and that any media exposure did not affect their identifications. The fact that three of the witnesses knew defendant from previous encounters could also raise the level of reliability. There was also

testimony that the three witnesses who identified defendant from the photo array did so without hesitation. In addition, the eyewitness testimony of the various witnesses corroborated one another. The jury could have reasonably weighed the eyewitness testimony and concluded that defendant was guilty, as it would be highly unlikely to find that all of the witnesses were not credible.

{¶ 114} Furthermore, although there was no DNA or fingerprint evidence linking defendant to the shooting, and although the surveillance photos were somewhat fuzzy and unclear, the jury was aware of the fact that a sport-utility vehicle bearing temporary tags and matching the description of the vehicle driven away from the scene by the shooter was located at the residence listed on defendant's driver's license. The jury may have reasonably determined that this evidence corroborated the eyewitness testimony.

{¶ 115} In addition, although the state is not required to prove motive, the testimony revealed that the shooting was apparently the result of the defendant's belief that Eugene owed him money, either the leftover change from the drinks defendant had purchased earlier or money from some other event not known to the witnesses. This could have provided the jury with a reason for the shooting.

{¶ 116} Finally, defendant's arguments regarding the ineffectiveness of counsel as part of his challenge to the manifest weight of the evidence in this case have already been discussed in the third and seventh assignments of error. Moreover, a manifest-weight challenge considers the weight of the evidence, not the effectiveness of counsel.

{¶ 117} Therefore, we cannot find that the jury clearly lost its way and created such a manifest miscarriage of justice that the convictions must be overturned. Accordingly, defendant's eighth assignment of error is overruled.

{¶ 118} In his sixth assignment of error, defendant argues that the trial court erred by imposing concurrent sentences for the attempted-murder and felonious-assault offenses because they are allied offenses of similar import committed with a single animus. As a result, defendant asserts that the prosecution should have elected to have defendant sentenced on only one of the offenses. Defendant further argues that multiple penalties under these circumstances also constitute double jeopardy.

{¶ 119} The state, on the other hand, cites *State v. Williams*, 124 Ohio St.3d 381, 922 N.E.2d 937, 2010-Ohio-147, and argues that because there were two shots fired at Alicia, and because the shots were fired separately and with a separate animus, merger of the attempted-murder and felonious-assault offenses is not required. The state submits that because each shot represents a separately punishable act, defendant can be convicted and sentenced on both offenses.

{¶ 120} R.C. 2941.25 is Ohio's merger statute. It requires a two-step analysis and provides as follows:

(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

{¶ 121} R.C. 2941.25 codifies the protections of the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution and Section 10, Article I of the Ohio Constitution. *State v. Underwood*, 124 Ohio St.3d 365, 2010-Ohio-1, 922 N.E.2d 923, ¶ 23. Both the statute and the Constitutions prohibit multiple convictions for the same conduct. Id. at ¶ 27.

{¶ 122} In *State v. Cabrales*, 118 Ohio St.3d 54, 2008-Ohio-1625, 886 N.E.2d 181, the Supreme Court of Ohio found:

In determining whether offenses are allied offenses of similar import under R.C. 2941.25(A), courts are required to compare the elements of offenses in the abstract without considering the evidence in the case, but are not required to find an exact alignment of the elements. Instead, if, in comparing the elements of the offenses in the abstract, the offenses are so similar that the commission of one offense will necessarily result in commission of the other, then the offenses are allied offenses of similar import.

Id. at paragraph one of the syllabus.

{¶ 123} Recently, in *Williams*, the Supreme Court of Ohio decided the issue whether felonious assault and attempted murder are allied offenses of similar import. In part, it held that felonious assault, as defined in R.C. 2903.11(A)(2), which involves causing or attempting to cause physical harm by means of a deadly weapon, is an allied offense of attempted murder as defined in R.C. 2923.02 and 2903.02(A), which involves an attempt to purposely cause the death of another. This holding is directly applicable to the instant case.

{¶ 124} However, because the merger statute requires a two-step analysis, we must go on to the second step. Even though these two crimes are allied offenses, we must determine whether the offenses were committed separately or with a separate animus as to each. *Cabrales* at ¶ 31; *Williams* at ¶ 16. If the offenses were committed separately or with a separate animus, merger is not required and

defendant could be convicted and sentenced on both offenses. *Cabrales* at ¶ 14, citing *State v. Blankenship* (1988), 38 Ohio St.3d 116, 117, 526 N.E.2d 816.

{¶ 125} In *Williams*, the accused fired two shots at the victim. One shot struck the victim and instantly paralyzed him; the other shot missed the victim. For each shot fired, Williams was charged with one count of attempted murder and one count of felonious assault. As a result, he was indicted on two counts of attempted murder and two corresponding counts of felonious assault (as well as a weapon-under-disability offense).

{¶ 126} The Supreme Court of Ohio determined that each felonious-assault offense was not committed with an animus separate from its allied attempted-murder offense and therefore, each felonious-assault count would merge with its respective ("allied") attempted-murder count. Stated another way, for each bullet that was fired at the victim, Williams could be convicted of either attempted murder or felonious assault, but not both. Because there were two shots fired, Williams could be convicted on two offenses but he could not be convicted and sentenced on all four offenses. Thus, pursuant to *State v. Whitfield*, 124 Ohio St.3d 319, 2010-Ohio-2, 922 N.E.2d 182, the *Williams* court determined that the prosecution had to elect upon which charges it wished Williams to be sentenced.

{¶ 127} In the instant case, the state appears to argue that because there were two separate shots fired at Alicia, each shot, like in *Williams*, constitutes a separately punishable act committed with a separate animus. Therefore, the state submits that the felonious-assault and attempted-murder offenses are separate offenses that were committed with a separate animus and as a result, they do not merge, thereby allowing defendant to be sentenced on both offenses.

{¶ 128} The evidence in this case supports the conclusion that defendant fired two shots at Alicia. This is demonstrated by the testimony of several witnesses who claimed to have heard two more shots after Eugene was shot. The testimony of Lenora seems to indicate that the first bullet missed Alicia and that she was struck by the second shot. The testimony of a second witness, Toni Lee, indicated Alicia was shot by defendant near a pole as she was running away and that defendant fired another shot as she tried to run to the bathroom, at which time Alicia fell into the bathroom door. Additionally, Cornell testified that defendant shot Alicia in both buttocks as she was running away. Furthermore, Alicia's medical records, which were admitted into evidence, as well as her own testimony, indicate that she had gunshot wounds in two places—the left hip and the right buttock. Finally, the evidence admitted at trial shows that three shell casings were recovered at the scene.

{¶ 129} As a result, we find that the evidence sufficiently establishes that defendant fired two separate shots at Alicia and attempted to either purposely

cause her death or caused or attempted to cause her physical harm through the use of a deadly weapon on two occasions. Therefore, pursuant to the Supreme Court of Ohio's recent ruling in *Williams*, we find that the attempted-murder and felonious-assault offenses were committed with a separate animus and, as a result, they are separately punishable.

{¶ 130} We note that the holding in *Williams* appears to depart from earlier precedent established by the Supreme Court of Ohio on the issue of separate animus and seems to disregard previous factors, such as temporal continuum. See *State v. Cotton*, 120 Ohio St.3d 321, 2008-Ohio-6249, 898 N.E.2d 959 (one victim stabbed three times could not result in a sentence for two felonious-assault convictions because the stabbings resulted from the same animus); and *State v. Harris*, 122 Ohio St.3d 373, 2009-Ohio-3323, 911 N.E.2d 882 (defendant was found guilty of three counts of robbery and three counts of aggravated robbery arising out of the same incident and involving three victims. Because all six offenses were committed simultaneously, the court found that the crimes had been committed with the same animus and the convictions must be merged). However, because we must follow the law and decisions of the Supreme Court of Ohio, unless or until they are overturned or reversed, we are bound to follow *Williams*. Accordingly, we overrule defendant's sixth assignment of error.

{¶ 131} In conclusion, we overrule defendant's first, second, third, fourth, fifth, sixth, seventh, and eighth assignments of error and affirm the judgment of the Franklin County Court of Common Pleas.

Judgment affirmed.

BROWN and MCGRATH, JJ., concur.