[Cite as *State v. Hess*, 2014-Ohio-3193.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
WASHINGTON COUNTY

STATE OF OHIO,                              :

    Plaintiff-Appellee,                  :
                                 Case No. 13CA15

    v.                                   :

                                     <u>DECISION AND</u>
DANIEL R. HESS,                             :   <u>JUDGMENT ENTRY</u>

    Defendant-Appellant.                 :   RELEASED 07/14/2014

---

APPEARANCES:

Angela Wilson Miller, Jupiter, Florida, for Appellant.

James E. Schneider, Washington County Prosecuting Attorney, and Alison L. Cauthorn, Washington County Assistant Prosecuting Attorney, Marietta, Ohio, for Appellee.

---

Hoover, J.

{¶ 1} Defendant-appellant, Daniel R. Hess, appeals his conviction and sentence in the Washington County Common Pleas Court. Following trial, a jury returned a verdict finding Hess guilty of two counts of sexual battery. Thereafter, the trial court sentenced Hess to 54 months imprisonment on each count, to be served consecutively for an aggregated prison sentence of 9 years. Hess was also classified as a Tier III sex offender, informed that that he would be placed on post-release control for a period of 5 years, and ordered to pay court costs and restitution upon his release from prison. For the following reasons, we affirm the judgment of the trial court.

{¶ 2} Hess was indicted by a Washington County grand jury for two counts of sexual battery, both felonies of the third degree, in violation of R.C. 2907.03(A)(5). It was alleged that Hess, and his girlfriend/co-defendant, Lacey Day, engaged in sexual conduct with his then

fifteen year-old daughter, Kayla Hess. Hess originally pled not guilty to both counts at his arraignment, and attorney Rolf Baumgartel was appointed as defense counsel. Thereafter, attorney Baumgartel filed a Written Plea of Not Guilty By Reason of Insanity and Suggestion of Incompetence on Hess's behalf. The very next day the trial court held a hearing to address the not guilty by reason of insanity ("NGRI") plea and suggestion of incompetence.

{¶ 3} At the hearing and by subsequent entry, the trial court ordered the Forensic Diagnostic Center of District Nine, Inc., to evaluate whether Hess was competent to stand trial and to determine his mental condition at the time of the commission of the alleged offenses. Sometime later a second hearing was held on the NGRI plea and suggestion of incompetence. At the second hearing, the trial court read a portion of the evaluation report completed by the Forensic Diagnostic Center. The evaluation report opined that Hess did not suffer from a mental illness or mental defect. However, the report did state that Hess exhibited symptoms of Post-Traumatic Stress Disorder due to his previous military experience, and that Hess conveyed "odd and unconventional" religious beliefs. Ultimately, the report opined that Hess was capable of understanding the nature and objective of the proceedings against him and of assisting counsel in his own defense.[1] Defense counsel stipulated to the finding that Hess was competent to stand trial, but did not withdraw the NGRI plea.

{¶ 4} Not long after it was determined that Hess was competent to stand trial, Hess requested new trial counsel. Attorney Baumgartel was removed and attorney Jack Blakeslee was appointed as new defense counsel.[2]

---

[1] The report, or at least the portion read out loud by the trial court at the second hearing, did not opine as to Hess's sanity at the time of the alleged incidents. The record before us does not contain a copy of the report.

[2] It also appears from a review of the record that the trial judge who presided over the competency hearings differs from the judge who eventually presided over trial.

{¶ 5} The case ultimately proceeded to jury trial. After the jury was sworn in, but before opening statements, two jurors indicated to the trial court that they believed they knew the victim, Kayla Hess. Both women, Juror Gentile and Juror Swick, were teachers at Warren High School and believed that the victim may have been their student. The trial court questioned the two jurors in chambers.

{¶ 6} The in chambers voir dire of the two jurors was recorded, but the audio recording is apparently of poor quality. As a result, the transcript of the in chambers voir dire contains a few "inaudibles." Nonetheless, the transcript reveals that Juror Gentile confirmed that she knew the alleged victim. In response to the trial court's question of whether she could return a fair and impartial verdict in the case, Juror Gentile confirmed that she could do so. Neither the State nor defense counsel asked any questions of Juror Gentile during the in chambers voir dire. Juror Gentile ultimately served on the jury.

{¶ 7} The transcript involving the in chamber voir dire questioning of Juror Swick contains more "inaudibles" than the questioning of Juror Gentile. However, we can discern from the transcript that Juror Swick, while initially expressing concerns that her appearance on the jury might upset the victim, ultimately answered the court's question of whether she could be fair and impartial with an affirmative "yes." Juror Swick did remain on the jury.

{¶ 8} At trial, the State called two witnesses: Kayla Hess, and Detective Mark Johnson of the Washington County Sheriff's Office.

{¶ 9} Kayla Hess testified that she did not have a relationship with her father for most of her life, but that she reconnected with him as well as his live-in girlfriend, Lacey Day, after she had disagreements with her mother around Thanksgiving 2009. Kayla testified that she began visiting Hess and Day at their home in December 2009.

{¶ 10} Kayla stated that her relationship with Hess and Day turned sexual in December 2009 or January 2010.[3] It was around this time that Kayla said that Hess often discussed "The Power of Three" and the need of all three of them to engage in sexual intercourse to protect them from evil forces. Kayla testified that Hess practiced a religion that encompassed "Wiccan" and "Pagan" beliefs, and he often discussed spirits, powers, and magical things. According to Kayla, both she and Day drank alcohol before having sex with each other and Hess. Kayla testified that after the first sexual encounter, Hess stated that the three of them had done what God wanted them to do.

{¶ 11} Kayla testified that a second sexual encounter occurred approximately two months later. That time, Kayla testified that she was told that she had done something wrong in that she had "shunned away." Kayla was told that because she had a sexual relationship with her boyfriend, a "dark person" or "demon", she had destroyed the benefits of "The Power of Three." Kayla testified that she, Day, and Hess engaged in sex again to restore the protection. Kayla also testified that there was a third sexual encounter sometime later, involving only her and Hess, in which Hess cornered her in the bathroom and forcefully had sex with her.

{¶ 12} Finally, Kayla testified that at first, she was too scared of Hess to report the incidents. However, she reported the incidents in March 2012[4], after she started to feel physically ill about the incidents. She also testified that she agreed to wear a body wire when visiting Hess and Day, to assist in the law enforcement investigation. Approximately 57 minutes of the taped conversation, acquired by the body wire, was played for the jury. The conversation involved a wide range of topics, including discussions about "The Power of Three," relationship advice, bringing other people in, stopping people's hearts, demons, the devil, energy, puppies, shampoo,

---

[3] Kayla was 15 years-old at the time of the first sexual encounter.
[4] Kayla Hess turned 18 years-old in April 2012.

oral sex, mind reading, witches, and more. At one point during the conversation, Kayla Hess asked: "When you were having sex with me, did you have to watch [the heartbeat]?" [Transcript at 164.] Lacey Day responded "Yeah[,]" and Daniel Hess responded "Yeah. I kept it low, so I didn't kill you. I had one woman, I had to stop and get her aspirin, she was going to have a heart attack, if I didn't." [Transcript at 164-165.] At another time during the conversation, the following colloquy took place:

Kayla Hess: I feel awkward now around you guys because of what we had to do.

Daniel Hess: I don't. I don't think about it. And Lacey don't think about it.

Kayla Hess: You're my dad. I'm going to think about it.

Daniel Hess: At that time, you didn't. And that's exactly what you said. It's just

fuck. That was your own words. And now its bothering you[?]

[Transcript at 176.] Later in the conversation, Kayla discussed how she couldn't stop thinking about how she had sex with Hess and Day, to which Hess responded, "That's okay. Is it a bad thinking or is it a good thinking?" [Transcript at 181.]

{¶ 13} Detective Johnson testified that he assisted in prepping Kayla for the taped conversation with Hess and Day. Detective Johnson further testified that immediately after procuring the taped conversation between Kayla, Hess, and Day, he made contact with Hess at his residence. Johnson informed Hess that he had no obligation to engage in conversation. Nevertheless, Johnson testified that during this encounter, Hess denied having sex with Kayla, but did say that Kayla's account of the events were true to a degree. Johnson then placed Hess under arrest. The conversation between Hess and Johnson was played for the jury.

{¶ 14} Hess testified in his own defense at trial. Hess testified that he is a follower of Shamanistic Pagan Psy-vamp beliefs. Hess stated that Psy-vamps feed off of energy sources, or

pull energy from energy sources such as people or lights. Hess testified that Psy-vamps differ from Sanguinarian vamps, which must feed on blood to survive. Hess further explained that The Power of Three is "an energy feeding ritual," where three people are joined in a triangle. Hess stated that the ritual does not involve physical touching, but rather a pushing of energy towards an individual, with the goal that the energy grows within the individual.

{¶ 15} Hess further testified that God directed him to engage in "energy sex" with Kayla. Hess described "energy sex" as using the power of energy, rather than physical touch, to produce a sexual orgasm. Hess, however, specifically denied ever physically touching Kayla in a sexual manner. Hess testified that energy sex is a form of self-preservation, and that as a Psy-vamp he needs to continuously feed on energy. Hess also explained that his comment to Detective Johnson, that Kayla's account was true to a degree, meant that they engaged in energy sex; not physical sex.

{¶ 16} At the conclusion of the case, the trial court gave instructions to the jury. The trial court's instructions never mentioned insanity and defense counsel never sought an insanity instruction. The jury was also not informed that Hess entered a plea of NGRI. After deliberations, Hess was found guilty of two counts of sexual battery. The trial court ordered a pre-sentence investigation and scheduled a sentencing hearing for a later date. In the interim, Hess again filed a motion requesting new counsel. The motion was denied.

{¶ 17} Hess was ultimately sentenced to 54 months imprisonment on each sexual battery count, to be served consecutively for an aggregate prison sentence of 9 years. Additionally, Hess was classified as a Tier III sex offender, informed that he would be subject to post-release control for a period of five years following his release from prison, and ordered to pay court costs and restitution upon his release.

{¶ 18} Hess filed a timely notice of appeal, and appellate counsel was appointed. An amended sentencing entry was filed after Hess filed his notice of appeal, correcting minor typos and errors, but otherwise leaving the original sentencing entry untouched.

{¶ 19} Along with his merit brief, Hess simultaneously filed a document titled "Appellant Daniel Hess's Attempt To Prepare 9(C) Statement." The filing contends that Hess is unable to recreate the portion of the transcript that contains the inaudibles due to the poor recording and a lack of memory of the participants involved. The document is supported by the affidavits of the trial court transcriptionist and of appellate counsel.

{¶ 20} On appeal, Hess asserts the following assignments of error for our review:

First Assignment of Error:

> THE TRIAL COURT'S FAILURE TO INFORM AND INSTRUCT THE JURY ON HESS'S DEFENSE OF INSANITY VIOLATED HIS CONSTITUTIONAL RIGHT TO A TRIAL BY JURY. U.S. CONST. AMENDS. V, VI, AND XIV; OHIO CONSTITUTION ARTICLE 1 §§ 5 AND 16. THIS ERROR IS A STRUCTURAL DEFECT AND WARRANTS REVERSAL.

Second Assignment of Error:

> APPELLANT HESS WAS DENIED THE RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL AND A FAIR AND IMPARTIAL JURY WHEN HIS TRIAL COUNSEL: 1) FAILED TO INSIST THAT THE JURY BE NOTIFIED THAT HESS HAD ENTERED A PLEA OF NGRI OR REQUEST A JURY INSTRUCTION ON THAT PLEA AND; 2) NEGLECTED TO QUESTION PROSPECTIVE JURORS ABOUT THEIR RELATIONSHIPS WITH THE VICTIM AND ALLOWED THEM TO REMAIN ON THE JURY, IN VIOLATION OF APPELLANT'S RIGHTS UNDER THE FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS TO THE U.S CONSTITUTION AND ARTICLE I §§ 5, 10, 16 OF THE OHIO CONSTITUTION.

Third Assignment of Error:

> THE TRIAL COURT COMMITED REVERSIBLE ERROR WHEN IT FAILED TO PROPERLY RECORD ITS PROCEEDINGS. FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, ARTICLE I §§ 10 AND 16 OF THE OHIO CONSTITUTION, AND CRIM.R. 22.

Fourth Assignment of Error:

A TRIAL COURT MUST STATE THE FINDINGS REQUIRED IN R.C. 2929.14 AND THE REASONS SUPPORTING THOSE FINDINGS IN THE SENTENCING ENTRY. THE FAILURE TO DO SO VIOLATES R.C. 2929.14(C)(4), CRIM.R. 32(A)(4).

{¶ 21} In his first assignment of error, Hess contends that the trial court erred when it failed to instruct the jury that he had entered a NGRI plea and when it failed to instruct the jury on the effect of the NGRI plea. In essence, Hess asserts that the defense, the State, and the trial court all forgot that he entered a NGRI plea; and the failure to mention the NGRI plea or to instruct the jury on the plea rendered his trial unreliable. Hess argues that such an error is a structural defect that warrants reversal and a new trial. We disagree.

{¶ 22} As an initial matter, we note that the test to determine competency to stand trial differs from the test to determine whether a defendant is not guilty by reason of insanity. A defendant is competent to stand trial if he " 'has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding – and whether he has a rational as well as factual understanding of the proceedings against him.' " *State v. Merryman*, 4th Dist. Athens No. 12CA28, 2013-Ohio-4810, ¶ 15, quoting *Dusky v. United States,* 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960); *see also* R.C. 2945.37(G) (codifying the competency test). A claim of insanity, meanwhile, "is an affirmative defense that a defendant must prove by a preponderance of the evidence." *State v. Waller*, 4th Dist. Scioto No. 10CA3346, 2011-Ohio-2106, ¶ 9, citing *State v. Hancock*, 108 Ohio St.3d 57, 2006-Ohio-160, 840 N.E.2d 1032, ¶ 35. An accused is not guilty by reason of insanity if he or she can prove that at the time of the commission of the offense, the accused did not know, because of severe mental disease or defect, the wrongfulness of the accused's acts. R.C. 2901.01(A)(14); *Hancock* at ¶ 35. Thus, if sufficient evidence of insanity is presented at trial, the trial court must give a jury instruction on the affirmative defense. *Waller* at ¶ 9. Conversely, a trial court does not err in failing to give an insanity

instruction to the jury where the evidence presented at trial does not warrant an instruction. *State v. Dunn*, 3d Dist. Allen No. 1-95-74, 1996 WL 379651, *6-7 (June 28, 1996).

{¶ 23} Under Crim.R. 30(A) "a party may not assign as error the giving or failure to give any instructions unless the party objects before the jury retires to consider its verdict, stating specifically the matter objected to and the grounds of the objection." Thus, where a party fails to request that the jury be instructed on an issue, he or she waives all but plain error. *State v. Thompson*, 4th Dist. Vinton No. 12CA688, 2013-Ohio-2235, ¶ 23, citing *State v. Bradford*, 4th Dist. Adams No. 11CA928, 2013-Ohio-480, ¶ 19. But here, Hess argues that the trial court's failure to instruct the jury on his insanity defense was structural error that warrants reversal of the case. "[S]tructural errors are constitutional defects that defy analysis by harmless error standards because they affect[] the framework within which the trial proceeds, rather than simply [being] an error in the trial process itself." (Quotations omitted.) *State v. Perry*, 101 Ohio St.3d 118, 2004-Ohio-297, 802 N.E.2d 643, ¶ 17. Structural errors may be raised for the first time on appeal, and are cause for automatic reversal, because "[s]uch errors permeate the entire conduct of the trial from beginning to end so that the trial cannot reliably serve its function as a vehicle for determination of guilt or innocence." (Quotations omitted.) *Id*.

{¶ 24} Hess relies upon *State v. Cihonski*, 178 Ohio App.3d 713, 2008-Ohio-5191, 900 N.E.2d 212 (3rd Dist.), for support of his argument that the failure to instruct the jury on the NGRI plea constitutes a structural defect requiring reversal of the jury's verdict and a new trial. In *Cihonski*, the defendant entered a written plea of NGRI. *Id*. at ¶ 13. Neither the defense counsel nor the State ever mentioned the NGRI plea at trial, and the trial court never instructed the jury on the plea, despite the fact that the plea was never withdrawn. *Id*. at ¶ 14. In fact, it appeared as though defense counsel, the State, and the court "forgot" about the NGRI plea. *Id*.

{¶ 25} On appeal, the Third District Court of Appeals ultimately found that the failure of the trial court to instruct the jury on the insanity defense violated the defendant's constitutional right to a trial by jury. *Id.* at ¶ 22. Moreover, the court determined that never mentioning the NGRI plea was an error that permeated the entire trial; and no evidence existed to show that the jury ever considered the sanity defense. *Id.* at ¶ 23. Thus, the court determined that the trial was unreliable. *Id.* Accordingly, the appellate court determined that "due to the unique facts and circumstances before us, we hold that the trial court's failure to notify the jury that Cihonski entered a plea of NGRI or instruct the jury on that plea constituted structural error and warrants reversal." *Id.* The appellate court further held that trial counsel's failure to insist that the jury be notified of defendant's NGRI plea or to request a jury instruction on the plea constituted ineffective assistance of counsel. *Id.* at ¶¶ 25, 30.

{¶ 26} In response, the State argues that *Cihonski* "does not stand for the broad, black-letter proposition submitted by [a]ppellant." In support, the State references *State v. Monford*, 190 Ohio App.3d 35, 2010-Ohio-4732, 940 N.E.2d 634 (10th Dist.), in which the Tenth District Court of Appeals refused to follow the holding in *Cihonski*, and instead determined that the trial court's failure to address a NGRI plea did not constitute structural error. *Id.* at ¶ 71. In doing so, the *Monford* court noted that the defendant in *Cihonski* had advanced a defense of legal insanity at trial[5], whereas the defendant in *Monford* had never presented a NGRI defense. *Id.* at ¶ 74 ("Defendant did not present one shred of evidence to demonstrate, or even suggest, that he did not know the wrongfulness of his acts, nor did he ever indicate that he wished to present an NGRI defense."). The *Monford* court also denied the defendant's motion to certify a conflict

---

[5] Specifically, Cihonski had admitted to the conduct with which he was charged, but had testified that his actions were not voluntary and instead were the product of a "reflex action" and "panic attack." *Cihonski*, supra, at ¶ 7. Cihonski further testified that he had left a psychiatric hospital just a few days prior to the incident where he was treated for anxiety and panic attacks. *Id.*

between its decision and the *Cihonski* decision, noting that the cases were distinguishable due to their "markedly different factual circumstances." *State v. Monford*, 10th Dist. Franklin No. 09AP-274, 2010-Ohio-5624, ¶ 8.

{¶ 27} The State also cites other appellate court cases that have distinguished *Cihonski*. In *State v. Austin*, 1st Dist. Hamilton No. C-110359, 2012-Ohio-3053, the First District Court of Appeals rejected the structural error argument where the defendant failed to present evidence on insanity. *See Austin* at ¶ 10 ("Unlike the defendant in *Cihonski,* Austin put forth no evidence that related to an insanity defense. * * * We conclude that, absent the presentation of any evidence that would raise the issue of Austin's sanity, there was no error in not including an instruction about an NGRI defense.") Likewise, the Twelfth District Court of Appeals found the *Cihonski* structural error analysis inapplicable, when the trial court did not give an instruction to the jury on the defense of insanity, and where the defendant did not provide even "a scintilla of evidence" that he suffered from a mental disease or defect that caused him to be unaware of the wrongfulness of his actions at the time of the offense. *State v. Bradford*, 12th Dist. Warren No. CA2010-04-032, 2010-Ohio-6429, ¶ 89.

{¶ 28} We find that the instant case is more similar to the cases that have distinguished *Cihonski*. Like the defendants in *Monford*, *Austin*, and *Bradford*, Hess did not advance an insanity defense at trial. Rather, Hess denied wrongful conduct altogether, and instead testified that he engaged in "energy sex" with his daughter. His defense was not that he committed the offense as a result of a severe mental disease or defect, but that he never physically touched or engaged in sexual conduct with the victim. Moreover, there was no testimony regarding Hess's state of mind at the time of the alleged acts. A NGRI defense is wholly inconsistent with the theory that was presented at trial, i.e. that Hess did not engage in any wrongful conduct.

{¶ 29} Thus, we find *Cihonski* to be distinguishable to the case sub judice. The record evidence clearly does not support a NGRI defense, and no such instruction was warranted. Accordingly, the *Cihonski* structural-error analysis is not applicable. Moreover, plain error did not occur where the evidence did not warrant a NGRI instruction. Hess's first assignment of error is overruled.

{¶ 30} In his second assignment of error, Hess contends that he was denied effective assistance of counsel. Specifically, Hess argues that his trial counsel was ineffective for failing to address his NGRI plea and for failing to request a NGRI instruction. Hess also argues that his trial counsel failed to conduct an adequate inquiry of Juror Gentile and Juror Swick, during in chambers voir dire, and thus he was denied a fair and impartial jury.

{¶ 31} "In Ohio, a properly licensed attorney is presumed competent and the appellant bears the burden to establish counsel's ineffectiveness." (Quotations omitted.) *State v. Norman,* 4th Dist. Ross Nos. 08CA3059 & 08CA3066, 2009–Ohio–5458, ¶ 65. To establish constitutionally ineffective assistance of counsel, Hess must show (1) that his counsel's performance was deficient and (2) that the deficient performance prejudiced the defense and deprived him of a fair trial. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Issa,* 93 Ohio St.3d 49, 67, 752 N.E.2d 904 (2001); *State v. Goff,* 82 Ohio St.3d 123, 139, 694 N.E.2d 916 (1998). "In order to show deficient performance, the defendant must prove that counsel's performance fell below an objective level of reasonable representation. To show prejudice, the defendant must show a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different." *State v. Conway,* 109 Ohio St.3d 412, 2006–Ohio–2815, 848 N.E.2d 810, ¶ 95. "Failure to establish either element is fatal to the claim." *State v. Jones,* 4th Dist. Scioto No. 06CA3116, 2008–Ohio–968, ¶ 14.

{¶ 32} First, because Hess put forth no evidence that raised the issue of his sanity, we are unable to say that his counsel's failure to address the NGRI plea and failure to request the NGRI instruction was deficient. *See Austin*, 2012-Ohio-3053 at ¶ 11 ("Given our conclusion that Austin had put forth no evidence that raised the issue of his sanity, we are unable to say that counsel's performance was deficient.") Moreover, because Hess pursued a denial defense, rather than an insanity defense, any request for a NGRI jury instruction would have been denied. Thus, Hess was not prejudiced by his counsel's failure to request a NGRI instruction. *See Monford*, 190 Ohio App.3d 35, 2010-Ohio-4732, 940 N.E.2d 634, at ¶ 99 ("Given that counsel pursued the mistaken-identity defense through the use of an expert witness, and given that there was no evidence presented to persuade the jurors that at the time of the offense, defendant did not know the wrongfulness of his actions, any request for an NGI jury instruction would have been denied. Thus, defendant was not prejudiced by the lack of a request for an NGRI instruction.").

{¶ 33} In considering Hess's argument in regards to voir dire, we "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " *Strickland* at 689. This is particularly true in the instant case, because " '[f]ew decisions at trial are as subjective or prone to individual attorney strategy as juror *voir dire*, where decisions are often made on the basis of intangible factors.' " *State v. Mundt*, 115 Ohio St.3d 22, 2007-Ohio-4836, 873 N.E.2d 828, ¶ 64, quoting *Miller v. Francis*, 269 F.3d 609, 620 (6th Cir.2001). Typically, trial counsel is entitled to exercise wide discretion in formulating voir dire questions, and "is in the best position to determine whether any potential juror should be questioned and to what extent." *State v. Murphy*, 91 Ohio St.3d 516, 539, 747 N.E.2d 765 (2001). Moreover, "[t]he Ohio Supreme Court has

repeatedly declined to impose a 'hindsight view' as to how counsel might have examined the jury differently on voir dire." *Monford* at ¶ 82, citing *Mundt* at ¶ 63, and *State v. Mason*, 82 Ohio St.3d 144, 157, 694 N.E.2d 932 (1998).

{¶ 34} Hess takes issue with his trial counsel's in chambers voir dire of Juror Gentile and Juror Swick, arguing that he did not sufficiently question them regarding their potential bias that may have arisen from them knowing the victim. Hess contends that after the trial judge questioned them on their ability to act fairly and impartially, his counsel only asked one follow up question to Juror Swick, and no follow-up questions to Juror Gentile.

{¶ 35} "[P]osing only a few questions, or even no questions at all, to a prospective juror could potentially be the most advantageous tactic for defense counsel in some situations." *Monford* at ¶ 84. " ' "[Q]uestioning by other parties may convince counsel that the juror would be favorable for the defense, and that further questions might only antagonize the juror or give the prosecution a reason to use a peremptory challenge or even grounds for a challenge for cause." ' " *Id.*, quoting *Mundt* at ¶ 65, in turn quoting *People v. Freeman*, 8 Cal.4th 450, 485, 34 Cal.Rptr.2d 558, 882 P.2d 249 (1994). "It is not necessary for counsel to repeat questions about topics that have already been covered by opposing counsel or the judge." *Id.*, citing *State v. Coleman*, 85 Ohio St.3d 129, 135, 707 N.E.2d 476 (1999).

{¶ 36} Here, Hess's trial counsel could have reasonably determined that it was unnecessary to ask Juror Gentile and Juror Swick additional questions, as the judge's questioning had already established that these jurors could be fair and impartial. Their answers to the judge's questions did not indicate any bias, and trial counsel could have thought that additional questioning would only antagonize the jurors. Furthermore, prior to the in chambers voir dire, Juror Gentile and Juror Swick had completed the general voir dire questioning conducted upon

the entire jury panel, and defense counsel was apparently satisfied with their responses during that process. We reiterate that voir dire is a subjective process in which counsel is entitled to wide latitude, and thus, we decline to second guess whether counsel should have conducted voir dire differently. Hess's trial counsel engaged in reasonable trial strategy, and we cannot find ineffective assistance on the basis that trial counsel should have further questioned Juror Gentile and Juror Swick on the their ability to serve fairly and impartially.

{¶ 37} Hess also argues, in passing, that his counsel was ineffective for failing to remove Juror Swick for cause. However, Juror Swick's responses during in chambers voir dire did not form the basis for a challenge for cause. Crim.R. 24(C) provides, in pertinent part, that a person called as a juror may be challenged for the following causes: " * * * (9) That the juror is possessed of a state of mind evincing enmity or bias toward the defendant or the state; * * * (14) That the juror is otherwise unsuitable for any other cause to serve as a juror."

{¶ 38} Here, when the trial judge inquired as to whether Juror Swick could "keep an open mind[,]" set aside "personal knowledge[,]" and "render a fair and impartial verdict[,]" Juror Swick indicated, "Yes, Sir[,] * * * if Kayla was my student, it would have been completely on a student-teacher relationship[,] * * * I don't remember any personal conversations or anything." Upon further inquiry of the trial judge, Juror Swick again stated that she could be fair and impartial. Hess's counsel further inquired whether Juror Swick would be more inclined to believe Kayla's testimony because of their prior student-teacher relationship, to which Juror Swick responded that she knew the victim only as a troubled math student. The trial judge then asked defense counsel if he was satisfied, to which defense counsel responded "Yeah."

{¶ 39} Based on the exchanges during in chambers voir dire, Hess has not demonstrated that Juror Swick was actually biased against him. Thus, Juror Swick was not subject to removal

for cause under Crim.R. 24(C). Moreover, defense counsel's decision to forego use of a peremptory challenge on Juror Swick was not unreasonable, because Juror Swick clearly indicated that she could be fair and impartial.[6] "The use of peremptory challenges is 'inherently subjective and intuitive' and rarely does the record reveal 'reversible incompetence in this process.' " *Monford*, 190 Ohio App.3d 35, 2010-Ohio-4732, 940 N.E.2d 634, at ¶ 94, quoting *Mundt*, 115 Ohio St.3d 22, 2007-Ohio-4836, 873 N.E.2d 828, at ¶ 83. Moreover, "[s]o long as a juror indicates that he can be fair and impartial, counsel is not ineffective in declining to exercise a peremptory challenge." (Citations omitted.) *Id*.

{¶ 40} Accordingly, we find no merit in Hess's ineffective assistance arguments, and overrule his second assignment of error.

{¶ 41} In his third assignment of error, Hess contends that the trial court committed reversible error when it failed to properly record its proceedings in violation of Crim.R. 22. Specifically, Hess argues that the poor recording of the in chambers voir dire questioning of Juror Swick resulted in an incomplete transcript containing fourteen "inaudibles" within one and one-half pages of text. Thus, Hess asserts that our review of the in chambers voir dire is vitiated because of the poor transcript. Hess also claims that he attempted to submit an App.R. 9(C) statement to correct or supplement the record but was unable to do so because the individuals involved could not recall the proceedings.

{¶ 42} Crim.R. 22 provides that, in serious offense cases, "all proceedings shall be recorded." Because "serious offense" cases include felony cases, the trial court had a duty to record the proceedings in this case. Crim.R. 2(C); *State v. Adams*, 4th Dist. Scioto Nos. 04CA2959 & 05CA2986, 2009-Ohio-6491, ¶ 16. However, it is the duty of the appellant to

---

[6] It is not clear whether a peremptory challenge would have even been appropriate here, because as mentioned above, the in chambers voir dire occurred after the jury had been sworn and peremptory challenges exercised.

provide a transcript for appellate review. *Knapp v. Edwards Laboratories*, 61 Ohio St.2d 197, 199, 400 N.E.2d 384 (1980). "This is necessarily so because an appellant bears the burden of showing error by reference to matters in the record." *Id*.; *see also* App.R. 9(B). "When portions of the transcript necessary for resolution of assigned errors are omitted from the record, the reviewing court has nothing to pass upon and thus, as to those assigned errors, the court has no choice but to presume the validity of the lower court's proceedings, and affirm." *Id*.

{¶ 43} The Ohio Rules of Appellate Procedure provide a remedy that preserves the right of full review in situations where the record is incomplete or inaccurate. An appellant may prepare a statement of the evidence or proceedings from the appellant's own recollection pursuant to App.R. 9(C), submit an agreed statement of the parties pursuant to App.R. 9(D), or make corrections to the record by party stipulation under App.R. 9(E). In this case, Hess asserts that a complete transcript of the in chambers voir dire of Juror Swick could not be prepared due to the poor quality of the recordings. Furthermore, Hess has filed a document in this Court, in which his appellate counsel contends that an App.R. 9(C) statement covering this portion of the trial is not possible given the combination of poor recording equipment/radio interference and the inability of Hess, trial counsel, and Juror Swick to recall the details of voir dire with sufficient particularity.

{¶ 44} We have previously noted that convictions and sentences will not be reversed on the basis that in chambers conferences were not recorded, where the defendant fails to show that: " '(1) a request was made at trial that the conference be recorded or that objections were made to the failures to record, (2) an effort was made on appeal to comply with App.R. 9 and to reconstruct what occurred or to establish its importance, and (3) material prejudice resulted from the failure to record the proceedings at issue.' " *Adams* at ¶ 18, quoting *State v. Palmer*, 80 Ohio

St.3d 543, 554, 687 N.E.2d 685 (1997); *see also State v. Warren*, 4th Dist. Ross No. 12CA3324, 2013-Ohio-3542, ¶ 40 (noting that a defendant must show prejudice resulting from the deficient record to succeed on appeal).

{¶ 45} In this case, the in chambers voir dire of Juror Swick was recorded. However, even if we were to presume that Hess made sufficient efforts to comply with App.R. 9, we nonetheless conclude that he has failed to demonstrate material prejudice as a result of the incomplete record.

{¶ 46} Hess contends that the "inaudibles" contained within the transcript of the in chambers voir dire of Juror Swick interferes with our ability to judge trial counsel's ineffectiveness. "An appellant might be prejudiced where another assignment of error is incapable of review because of the inadequate record." *Warren* at ¶ 41, citing *State v. Beltowski*, 11th Dist. Lake No. 2006-L-032, 2007-Ohio-3372, ¶ 29. However, we have already determined that Hess's trial counsel was not ineffective in his voir dire examination of Juror Swick. More importantly, the record did not hinder our review of the assigned error. The material portions of Juror Swick's in chambers voir dire were adequately recorded and transcribed so that we could review the substance of the questions and responses and ultimately determine that Juror Swick exhibited an ability to be fair and impartial. Stated differently, any omissions in the record are immaterial, and we are able to adequately review Hess's argument that his counsel was ineffective.

{¶ 47} Hess has not demonstrated that the faulty recording equipment and resulting transcript materially prejudiced him. Accordingly, his third assignment of error is overruled.

{¶ 48} In his fourth and final assignment of error, Hess contends that the trial court erred in ordering him to serve each of the sentences on the sexual battery convictions consecutively to

one another. Specifically, Hess argues that in addition to making the findings required by R.C.

2929.14(C)(4), the trial court was also required to state its reasons supporting those findings in

order to impose consecutive sentences. We disagree.

{¶ 49} Hess claims that "Ohio appellate courts are issuing varying opinions on this issue,

sometimes even within the same district." [Brief at 18.] Despite this claim, Hess has failed to cite

a single appellate opinion that mandates sentencing courts to include reasons in support of the

statutory findings. Rather, Hess argues that the Ohio Supreme Court has accepted the case, *State*

*v. Bonnell*, OSCT No. 13-0167, to determine, among other issues, whether sentencing courts

must include reasons supporting consecutive sentences under 2929.14(C)(4). However, the Ohio

Supreme Court has yet to issue its opinion in *Bonnell*.

{¶ 50} This Court recently discussed consecutive sentencing law in *State v. Bever*, 4th

Dist. Washington No. 13CA21, 2014-Ohio-600, ¶¶ 15-16, noting that:

> R.C. 2929.14(C)(4) sets forth certain findings that a trial court must make prior to
>
> imposing consecutive sentences. *State v. Black,* 4th Dist. Ross No. 12CA3327,
>
> 2013–Ohio–2105, ¶¶ 56–57. That is, under Ohio law, unless the sentencing court
>
> makes the required findings set forth in R.C. 2929.14(C)(4), there is a
>
> presumption that sentences are to run concurrently. *Black* at ¶ 56; R.C.
>
> 2929.41(A).
>
> Under R.C. 2929.14(C)(4), a sentencing court must engage in a three-step
>
> analysis and make certain findings before imposing consecutive sentences. *Black*
>
> at ¶ 57; *State v. Clay,* 4th Dist. Lawrence No. 1 1CA23, 2013–Ohio–4649, ¶ 64;
>
> *State v. Howze,* 10th Dist. Franklin Nos. 13AP–386 & 13AP–387, 2013–Ohio–
>
> 4800, ¶ 18. Specifically, the sentencing court must find that (1) "the consecutive

service is necessary to protect the public from future crime or to punish the

offender"; (2) "consecutive sentences are not disproportionate to the seriousness

of the offender's conduct and to the danger the offender poses to the public"; and

(3) one of the following:

(a) The offender committed one or more of the multiple offenses while the

offender was awaiting trial or sentencing, was under a sanction imposed pursuant

to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-

release control for a prior offense.

(b) At least two of the multiple offenses were committed as part of one or more

courses of conduct, and the harm caused by two or more of the multiple offenses

so committed was so great or unusual that no single prison term for any of the

offenses committed as part of any of the courses of conduct adequately reflects

the seriousness of the offender's conduct.

(c) The offender's history of criminal conduct demonstrates that consecutive

sentences are necessary to protect the public from future crime by the offender.

R.C. 2929.14(C)(4).

{¶ 51} In *Bever*, we also found that the sentencing court is not required to give reasons

supporting the statutory findings. *See Bever* at ¶ 17 ("While the sentencing court is required to

make these findings, it is not required to give reasons explaining the findings."). This is

consistent with our previous decisions. *See State v. Swayne*, 4th Dist. Adams Nos. 12CA952,

12CA953, & 12CA954, 2013-Ohio-3747, ¶ 44 ("Although R.C. 2929.14(C)(4) does not require a

sentencing court to give reasons for its findings, the court did so here."), and *State v. Midlam*, 4th

Dist. Highland No. 12CA2, 2012-Ohio-6299, ¶ 11 ("Appellant claims that * * * the trial court

was required to state reasons in support of its [R.C. 2929.14(C)(4)] findings. Based upon the following reasoning of the Eighth District, we disagree.").

{¶ 52} In the case at hand, Hess does not contend that the trial court failed to make the statutory findings required by R.C. 2929.14(C)(4), or that the sentence is otherwise contrary to law.[7] Rather, Hess argues that the trial court was also required to give reasons in support of the statutory findings. This duty is simply not required under the statute, or by the case law governing this appellate district. We recognize that the Ohio Supreme Court may alter the current legal landscape when it releases its opinion in *Bonnell*, but until and unless it does so, we are bound by the precedent previously set forth by this Court. Accordingly, Hess's fourth assignment of error is overruled.

{¶ 53} Based on the foregoing, Hess's assignments of error are overruled, and the trial court's judgment is affirmed.

JUDGMENT AFFIRMED.

---

[7] A review of the record reveals that the trial court did make the necessary findings both on the record at the sentencing hearing, and in its sentencing entries.

**JUDGMENT ENTRY**

It is ordered that the JUDGMENT IS AFFIRMED. Appellant shall pay the costs herein taxed.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Washington County Common Pleas Court to carry this judgment into execution.

IF A STAY OF EXECUTION OF SENTENCE AND RELEASE UPON BAIL HAS BEEN PREVIOUSLY GRANTED BY THE TRIAL COURT OR THIS COURT, it is temporarily continued for a period not to exceed sixty days upon the bail previously posted. The purpose of a continued stay is to allow Appellant to file with the Supreme Court of Ohio an application for a stay during the pendency of the proceedings in that court. If a stay is continued by this entry, it will terminate at the earliest of the expiration of the sixty day period, or the failure of the Appellant to file a notice of appeal with the Supreme Court of Ohio in the forty-five day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Supreme Court of Ohio. Additionally, if the Supreme Court of Ohio dismisses the appeal prior to the expiration of sixty days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Abele, P.J.: Concurs in Judgment & Opinion.
McFarland, J.: Concurs in Judgment Only.

For the Court

By:_____
            Marie Hoover, Judge

**NOTICE TO COUNSEL**

Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.