[Cite as *State v. Bell*, 2015-Ohio-4775.]

# IN THE COURT OF APPEALS

# ELEVENTH APPELLATE DISTRICT

# LAKE COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | **O P I N I O N** |
| Plaintiff-Appellee, | : | |
| - vs - | : | **CASE NO. 2015-L-017** |
| DVONTE C. BELL, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal from the Lake County Court of Common Pleas, Case No. 14 CR 000706.

Judgment: Affirmed.

*Charles E. Coulson*, Lake County Prosecutor, and *Teri R. Daniel*, Assistant Prosecutor, Lake County Administration Building, 105 Main Street, P.O. Box 490, Painesville, OH 44077 (For Plaintiff-Appellee).

*Edward M. Heindel*, 450 Standard Building, 1370 Ontario Street, Cleveland, OH 44113 (For Defendant-Appellant).

THOMAS R. WRIGHT, J.

{¶1} Appellant, Dvonte C. Bell, timely appeals the jury verdict convicting him of two counts of felonious assault with firearm specifications, two counts of aggravated burglary with firearm specifications, and having a weapon while under a disability. He argues that his convictions are against the weight of the evidence and based on insufficient evidence; that he was denied the effective assistance of counsel based on his attorney's failure to pursue a motion to suppress; and that the trial court erred in

permitting the prosecutor's improper closing arguments. For the following reasons, Bell's arguments lack merit.

{¶2} On September 7, 2014, Jamie Howard returned home with her one-year-old son from Chuck E. Cheese to the house she shared with her sister, Shakyra Howard, on Nebraska Street in Painesville, Ohio. Jamie's cousin, Quantana Howard, and her aunt, Wanda Howard also lived there. Jamie had been with her cousin Steffon Sanders and others. Quantana is Sanders' mother.

{¶3} Jamie was in Quantana's bedroom visiting for 15-20 minutes when Quantana asked her to lock the front door. As Jamie walked to lock the door that enters into the dining room, a man approached and entered the home. He said something like, "get back, get back" and "who's in here with you?" He did not have his face covered at this time. Jamie had never seen this man before, but she got a "good look at him." He was a dark man who was approximately 5'9" tall with facial hair.

{¶4} He then walked Jamie into Quantana's room because he could see the light from her television shining into the dining room. Jamie described him as giving her a push into the bedroom. Quantana was sitting on her bed, and Shakyra was sitting on a chair in Quantana's room. They were watching television. Before entering the room, the man pulled out a gun, covered his face with his shirt, and commanded "What you got? What you got?" Quantana told him that they "had nothing" and asked him not to shoot. The man shot twice and then ran from the home. Quantana was shot in the stomach. Shakyra ran to get her phone to call the police. She was shot in the leg.

{¶5} After initially speaking with the police, Sanders drove Jamie to Mentor, Ohio to drop off her son. They immediately drove back to the Nebraska Street home

and discovered the "whole neighborhood" standing there, including several relatives. According to Sanders, the crowd of people was trying to determine who shot his mother. A family friend, Dontae Cummings, showed Sanders and Jamie a photo on his phone of a potential suspect. It was an image of Dvonte Bell that Cummings had obtained from Facebook. Jamie indicated that although he looked similar to the shooter, she could not confirm if the person in the photo was the shooter because it was not a good image. Sanders showed the Facebook image to Detective Ticel and emailed it to him as well. Neither Sanders nor Jamie had known or heard of Dvonte Bell before that night.

{¶6} Jamie then provided Ticel with a description of the shooter. She confirmed in her trial testimony:

{¶7} "[Prosecutor]: * * * When you first saw him [the shooter] where was he at?

{¶8} "JAMIE HOWARD: At the front door.

{¶9} "[Prosecutor]: And when you first saw him was he concealed - - - was his identity or was his face covered any way at that point in time?

{¶10} "JAMIE HOWARD: No.

{¶11} " * * *

{¶12} "[Prosecutor]: Did you get a good look at him though?

{¶13} "JAMIE HOWARD: Yes.

{¶14} "* * * *

{¶15} "[Prosecutor]: Were the lighting conditions good enough where you could see his face?

{¶16} "JAMIE HOWARD: Yes."

{¶17} Approximately one week later, Jamie was at work at Dunkin Donuts when she recognized the shooter as a passenger in a car driven by Malcomb Cox. Cox used to date Jamie's cousin. She did not call the police, but she told Quantana and Sanders, who notified the police. Several days later, Jamie picked the image of Dvonte Bell as the shooter via a photo lineup. Although she testified at trial that she identified the person depicted in photo number three as the shooter, she did not directly identify the man sitting at the defense table as the shooter. She was never asked to do so by the state or the defense.

{¶18} Officer Tsevdos also testified and stated that he interviewed Jamie at the scene that night and she was not able to give him "any specific details about" the shooter's face and that she "stated that as he was coming up the steps to the porch he was lifting the shirt to cover up half of his face." Tsevdos confirmed that he wrote in his report that Jamie "did not see his face." Officer Alamo testified that Jamie advised him that the suspect was dark-skinned, thin black male with a thin beard. Alamo testified that Jamie confirmed that she would be able to identify the suspect if she saw him again.

{¶19} The two women who had been shot, Quantana and Shakyra, were only able to see the top of the shooter's face above the bridge of his nose since his head was partially covered with his shirt.

{¶20} Shakyra testified and confirmed that she had suffered a stroke before the shooting that affects her ability to recall events. She confirmed that she was shot in the leg by a male, whom she had never seen before. She stated that she had previously identified her shooter in court two weeks after the shooting. She was not asked by

either side to make an in-court identification of Bell as her shooter. She also confirmed that she previously testified that she chased the shooter down the street, which she now admits was not the truth.

{¶21} Quantana, Shakyra's cousin, also testified for the state. Quantana explained that Shakyra's stroke significantly impacts her memory. She confirmed that she is the "godmother" to Carey Johnson, referred to as Bixy. They are actually cousins, but she raised him since he was a newborn after his mother died. Bixy calls Quantana mom, and Sanders refers to Bixy as his brother. Quantana confirmed that she had never before seen the shooter and that his face was covered for the 35 seconds that he was in her room. Quantana was not asked to identify Bell at trial or in a photo lineup. She also stated that Shakyra did not chase the shooter down the street, but explained that Shakyra just "says things like that."

{¶22} Dontae Cummings also testified for the state pursuant to a subpoena. He did not want to testify. He explained that Sanders had called him and told him about the shooting. Cummings ran over to the home where there were about 15 people discussing who the shooter could have been. Cummings explained that he thought that Dvonte Bell might be involved in the shooting because he had seen Bell approximately 15-20 minutes before the shooting occurred, and because "Jamie described him to a T." Upon showing Jamie the Facebook image, he asked her if it was him, and she said yes.

{¶23} Cummings had been close friends with Dvonte Bell's brother growing up and was able to secure his image from his brother's Facebook page. Cummings briefly spoke with Bell in Cummings' driveway about 20 minutes before the shooting. He had not seen Bell in a long time and had never seen him in Painesville before. Bell was a

5

backseat passenger in Cox's car at the time. Bell rolled the window down to say hello to Cummings. Cummings also explained that Bixy used to live at the Nebraska Street home, and that everyone in town knew that Bixy and Cox did not get along. Cummings identified Dvonte Bell during the trial as the person he saw in his driveway minutes before the shooting.

{¶24} Detective Bailey testified that he administered the photo lineup for Jamie Howard. He confirmed that she said "yes" to folder number three, which contained the photo of Dvonte Bell. He also described that the photo that they used did not depict Bell with the "chin strap beard" that Jamie had described him as having on the night of the shooting. As a result of Jamie's identification, the officers arrested Bell nine days after the shooting. The photo used to secure his arrest, which was obtained from the Bureau of Motor Vehicles after Jamie's photo lineup, was more recent and depicted Bell with a "chin strap beard."

{¶25} Detective Ticel also testified for the state and explained that he had been to this Nebraska Street home before in connection with other investigations. He knew that Bixy previously lived there. In fact, Ticel was involved in prior surveillance drug buys from Bixy that occurred at this house, so he suspected that the shooting of two unarmed women had something to do with Bixy. Ticel was likewise aware of the feud between Bixy and Cox. Ticel was shown the Facebook photo by Sanders on the night of the shooting, but explained that the photo was very poor. Ticel also confirmed at trial that Jamie chose Bell's image as the shooter during the photo lineup. Further, during Ticels' custodial interview of Bell, Bell stated something to the effect of it is impossible

6

that you have any evidence or that "you have a gun." Yet Ticel had not told Bell that they had not recovered the gun involved in these shootings.

{¶26} Defense counsel objected to the lack of in-court identification of Bell by any of the three victims at trial. Out of the presence of the jury, counsel expressed concern that the state did not share "Brady material" with the defense as required and that the state was identifying Bell as the shooter via the detectives' hearsay testimony. The trial court disagreed explaining that the defense had the opportunity to ask the victims to identify Bell as the shooter, but it chose not to. Further, it overruled the hearsay objection and permitted the state to bring Jamie back in to rebut the objection. She was then asked to identify which photo she chose as the shooter in the photo lineup. She confirmed that she chose the photograph of Bell. However, she was still not asked whether the man sitting at the defense table, Bell, was the shooter. The prosecution later explained that it chose not to ask Jamie based on her fear of retribution and her recurring nightmares about the shooting. The trial court advised the defense that they could ask Jamie whether she can currently identify Bell as the shooter, and they did not.

{¶27} Bell was convicted of two counts of felonious assault, second degree felonies in violation of R.C. 2903.11(A)(2) with firearm specifications; two counts of aggravated burglary, first degree felonies in violation of R.C. 2911.11(A)(1) with firearm specifications; and having a weapon while under a disability, a third degree felony in violation of R.C. 2941.145. Bell had a prior felony conviction for aggravated robbery in Cuyahoga County. The jury found Bell not guilty of two counts of attempted murder and two counts of aggravated robbery.

7

**{¶28}** Appellant's three assignments of error assert:

**{¶29}** "The convictions were against the manifest weight of the evidence and not supported by sufficient evidence because there was no in court identification of Bell as the perpetrator and an extremely tainted out of court identification. (T.p. at 825-829.)

**{¶30}** "Bell was denied his right to effective assistance of counsel guaranteed to him by Art. 1, Sec. 10 of the Ohio Constitution and the Sixth and Fourteenth Amendments to the United States Constitution.

**{¶31}** "The trial court committed plain error when it permitted the prosecuting attorney to engage in improper closing argument engaging the passions of the jury trying to gain sympathy for the victims."

**{¶32}** Bell's first assignment of error challenges the weight and the sufficiency of the evidence supporting his convictions. Specifically, he claims that he that he was not the shooter and that his convictions were improper because there was no in-court identification of him as the shooter and his out-of-court identification was tainted.

**{¶33}** The Ohio Supreme Court explained the criminal manifest-weight-of-the-evidence standard of review in *State v. Thompkins,* 78 Ohio St. 3d 380, 678 N.E.2d 541 (1997), stating that the weight of the evidence addresses whether the state's or the defendant's evidence is more persuasive. *Id.* at 386-387. "'[A]lthough there may be sufficient evidence to support a judgment, it could nevertheless be against the manifest weight of the evidence. * * * 'When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a "thirteenth juror" and disagrees with the factfinder's resolution of the conflicting testimony.'" (Citations omitted.) *State v. Wilson*, 113 Ohio St.3d 382, 2007-

8

Ohio-2202, 865 N.E.2d 1264, ¶ 24-25, citing *Thompkins* at 386-387. Further, "weight of the evidence addresses the evidence's effect of inducing belief." *Id.*

**{¶34}** Whereas a challenge based on insufficient evidence invokes a due process concern and requires the assessment of whether the evidence is legally sufficient to support the verdict as a matter of law. *State v. Diar,* 120 Ohio St.3d 460, 2008-Ohio-6266, 900 N.E.2d 565, ¶113. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks,* 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

**{¶35}** Bell claims here that his identification as the shooter was lacking, erroneous, and improperly based on Cummings' hunch and that this hunch snowballed into his identification as the shooter. Bell claims that Sanders' introduction of Bell's Facebook photo as a suspect to Jamie and the detectives led to his wrongful identification and subsequent convictions. He does not challenge any other aspect of his convictions.

**{¶36}** "The burden of proof on the prosecution extends to every element of the crime charged, including the burden of proving beyond a reasonable doubt the identity of the defendant as the perpetrator of the crime for which he stands charged." *State v. May*, 8th Dist. Cuyahoga No. 43286, 1981 Ohio App. LEXIS 13434, *19 (June 18, 1981).

**{¶37}** Aggravated burglary, pursuant to R.C. 2911.11(A), prohibits, in part, a person (1) by force, stealth, or deception from (2) trespassing in an occupied structure

(3) with purpose to commit any criminal offense in the structure (4) if the offender inflicts physical harm on another *or* if the offender has a deadly weapon on his person at the time. R.C. 2903.11(A)(2) defines felonious assault and prohibits, in part, a person from knowingly causing physical harm to another by means of a deadly weapon.

**{¶38}** R.C. 2923.13(A) having weapons while under disability precludes, in part, any person from knowingly carrying or using any firearm if that person is under indictment for or has been convicted of any felony offense of violence.

**{¶39}** In *Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375 (1972), the United States Supreme Court outlined the reliability factors to use in assessing the identification of a suspect resulting from an otherwise suggestive police identification procedure. *Biggers* held that "the primary evil to be avoided is 'a very substantial likelihood of irreparable misidentification.' * * * It is the likelihood of misidentification which violates a defendant's right to due process * * *." (Citation omitted.) *Id.* at 198. The *Biggers* court considered the totality of the circumstances "to assess whether the identification was reliable even though the confrontation procedure was suggestive. * * * [T]he factors to be considered in evaluating the likelihood of misidentification include [1] the opportunity of the witness to view the criminal at the time of the crime, [2] the witnesses' degree of attention, [3] the accuracy of the witnesses' prior description of the criminal, [4] the level of certainty demonstrated by the witness * * *, and [5] the length of time between the crime and confrontation [identification]." *Id.* at 199-200.

**{¶40}** Ohio courts have employed these "reliability factors" in assessing victims' in-court and out-of-court identifications. *State v. Hogan*, 10th Dist. Franklin No. 11AP-644, 2012-Ohio-1421, ¶10-11 (noting that even though police procedure was

10

impermissibly suggestive, "suggestiveness of the [photo array] identification procedure and the reliability of the identification are two separate determinations * * *. [And] a suggestive identification procedure does not automatically require suppression of the identification itself.") *State v. Williams,* 73 Ohio St.3d 153, 163, 652 N.E.2d 721 (1995) (employing *Biggers* reliability factors in assessing out-of-court identifications); *State v. Gross*, 97 Ohio St.3d 121, 127, 2002-Ohio-5524, 776 N.E.2d 1061 (holding in part that although the show-up in that case was unduly suggestive, the identifications were nonetheless admissible upon reviewing the *Biggers* factors.)

**{¶41}** Jamie's positive identification of Bell as the shooter via the photo lineup came about one week after the shooting, and it occurred soon after she had a second opportunity to see Bell as a passenger in a car driven through the drive-through where she worked. Further, she confirmed that she had a good opportunity to see his face on the night of the shooting before he covered his face. The lighting was good, and she described meeting him face-to-face at her front door. Jamie demonstrated a high level of certainty at the time of her testimony, and her prior, lower level of certainty was when she was attempting to identify Bell as the shooter via a zoomed in Facebook image shown to her on a cellular telephone. She had never seen the shooter before that night. She then confirmed via her trial testimony that she selected Bell's image as the shooter.

**{¶42}** Bell claims that the fact that Jamie was shown his image before positively identifying him as the shooter taints that identification. Again, however, a family friend showed her the image and not the police. S*tate v. Monford*, 190 Ohio App.3d 35, 2010-Ohio-4732, 940 N.E.2d 634, ¶54-55 "witness exposure to photographs of the suspect shown on television prior to identification does not require suppression of the

11

identification" because the exposure was not a result of police action.)  Further, Bell's theory of wrongful identification was before the jury.  Defense counsel's closing remarks stressed the fact that the state lacked both photo lineup and trial identifications by Shakyra and Quantana.  Yet, defense counsel never asked either at trial whether they could identify Bell as the shooter.  Defense counsel also repeatedly argued in closing that this was a case of misidentification because Jamie's testimony was tainted by viewing Bell's photo before she identified him as the shooter.

**{¶43}** Additionally, a review of the photographs of Bell explains Jamie's uncertainty as to whether the image of Bell that was shown to her on the night of the shooting depicted the shooter.  This Facebook image of Bell appears to be an enlarged section of another photograph.  It is very dark, the details of the person's face in this photo are difficult to see, and the eyes of the individual in this image are reflecting the flash of the camera.  Unlike the Facebook photo, the image of Bell used by the City of Painesville police in the photo lineup is not blurry or zoomed in, and it clearly depicts Bell's face.  Further, if there was doubt as to the victim's ability to identify Bell as the shooter, the trial court specifically advised defense counsel that it should ask Jamie whether she was currently able to identify Bell as the shooter.  They did not.

**{¶44}** Finally, we must give the jury's decision as to Jamie's credibility as a witness great deference.  *State v. Covington*, 10th Dist. Franklin No. 02AP-245, 2002-Ohio-7037, ¶28. "Because the facts of this case reveal neither state action nor police misconduct, the alleged suggestiveness of [the defendant's] identification goes to the weight and reliability of the testimony rather than admissibility, a matter addressed through effective cross-examination."  *State v. Ware*, 10th Dist. Franklin No. 04AP-43,

2004-Ohio-6984, ¶55 citing *State v. Ball,* 10th Dist. Franklin No. 99AP-1288, 2000 Ohio App. LEXIS 4247 (Sept. 21, 2000).

**{¶45}** Accordingly, and upon reviewing the totality of the circumstances, we find that Jamie's photo lineup identification of Bell was proper, and that the defense arguments regarding Jamie's reliability were appropriately before the jury for its consideration. We do not find that Jamie's identification of Bell as the shooter created a "very substantial likelihood of irreparable misidentification." *Biggers* at 198. Bell was identified as the man who knowingly entered the Nebraska Street home, pulled out a gun, and shot two individuals. Further, his demands as to "what you got?" indicate his intent to commit a theft while in the home. Accordingly, Bell's convictions were not against the manifest weight of the evidence and were supported by sufficient evidence. Thus, his first assignment of error lacks merit and is overruled.

**{¶46}** Bell's second assignment of error is also founded on his theory that he was improperly identified as the shooter. First, Bell asserts that his trial counsel was ineffective for failing to move to suppress Jamie's identification of him as the shooter. Second, he claims he was denied the effective assistance of counsel based on counsels' failure to object to hearsay testimony about Jamie's identification of Bell via the photo lineup.

**{¶47}** A challenge on the basis of effective assistance of counsel requires the application of a two-part test. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052 (1984). First, an appellant must show that his counsel's performance was deficient, which requires a showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment. Second, an

13

appellant must demonstrate that his attorney's deficiencies were so serious that they prejudiced his defense and deprived him of a fair trial. *Id.* Further, the appellant has the burden to prove that he was prejudiced and must overcome the strong presumption that counsel's performance was sufficient. *State v. Smith*, 17 Ohio St.3d 98, 100, 477 N.E.2d 1128 (1985). To demonstrate prejudice, an appellant must establish that there exists a reasonable probability that but for his attorney's mistakes, he would not have been found guilty. *State v. Bradley,* 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraph three of the syllabus.

**{¶48}** The Sixth Amendment does not require counsel to pursue a motion to suppress in every case. *State v. Jefferson*, 9th Dist. Summit No. 20156, 2001 Ohio App. LEXIS 1281, *8-10 (Mar. 21, 2001). However, the failure to file a motion to suppress can constitute ineffective assistance of counsel if the motion implicates matters critical to the defense and if the failure results in prejudice. *Id.* at *10 citing *State v. Garrett*, 76 Ohio App. 3d 57, 63, 600 N.E.2d 1130 (11th Dist.1991).

**{¶49}** In the present case, Bell asserts that he was denied the effective assistance of counsel first via his trial attorneys' failure to pursue a motion to suppress Jamie's identification of him as the shooter via the out-of-court photo lineup. He claims that her viewing his photo as a possible suspect before the police conducted their photo lineup was unduly suggestive and resulted in his improper identification. He claims that it should have been excluded as the "fruit of the poisonous tree." For the following reasons, we disagree.

**{¶50}** The defendant has the burden to show the identification procedure was unduly suggestive, and if he satisfies that burden, then the court must assess whether

under the totality of the circumstances, the identification is reliable despite its suggestive character. *State v. Harris*, 2d Dist. Montgomery No. 19796, 2004-Ohio-3570, ¶19.

**{¶51}** We note that there is no argument that the photo lineup was not administered pursuant to the statutory mandates in R.C. 2933.83. Instead, Bell argues that Jamie's viewing of Bell's photo *before* the state conducted the photo lineup was improperly suggestive and caused her to choose him as the shooter. This argument could have been meritorious if the police had shown Jamie Bell's photo as a suspect in advance of the lineup. S*tate v. Monford*, 190 Ohio App.3d 35, 2010-Ohio-4732, 940 N.E.2d 634, ¶54-55. However, it was a family friend that showed her Bell's photo. Further, she explained that although the man in the photo resembled the shooter, she was unable to definitively identify the man in this initial photo as the shooter based on the poor quality of the image and since she did not personally know him. The lineup was then conducted approximately one week later and a different photo of Bell was used. The lineup resulted in her positive identification of Bell as the shooter.

**{¶52}** Jamie confirmed at trial that she identified the photo of Bell as the shooter. She was never asked to directly identify Bell in court by the prosecutor or defense counsel. Furthermore, in an effort to impeach their credibility, defense counsel referenced during cross-examination of Shakyra and Quantana that each had identified Bell as their shooter in a prior, municipal court proceeding. This transcript is not before us.

**{¶53}** Again, Jamie confirmed at trial that she had a good opportunity to see the shooter's face; that the lighting was good; and that she subsequently saw him at Dunkin Donuts after the shooting and before the photo lineup. Thus, even assuming that the

photo lineup was improperly suggestive, Jamie's identification was not so unreliable as to cause a likelihood of misidentification. Accordingly, we cannot conclude that the result of the trial would have been different or that the trial court would have granted a motion to suppress Jamie's identification of Bell as the shooter. Thus, there was no resulting prejudice.

**{¶54}** The second aspect of Bell's ineffective assistance of counsel claim alleges that his counsel was ineffective since they failed to object to the officers' hearsay testimony. Bell claims that the officers were permitted to testify that Jamie picked Bell's photo as the shooter during the photo lineup. Contrary to his argument, however, Bell's counsel did object on hearsay grounds. And in response to defense objections, the state recalled Jamie to testify and to confirm which photo depicted the shooter. Thereafter, and based on apparent strategic decisions, Bell's attorneys still did not ask Jamie for an in-court identification of Bell as the shooter. Thus, we cannot find that Bell's counsel was ineffective.

**{¶55}** Based on the foregoing, Bell's second assigned error lacks merit in its entirety.

**{¶56}** Bell's third and final assignment of error challenges statements made by the prosecutor during the state's closing argument. Bell claims the state improperly invoked sympathy for the shooting victims. As the state points out, however, there were no defense objections during closing arguments, and as such, Bell has waived all but plain error.

**{¶57}** "[N]otice of plain error is to be taken 'with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.'" *State*

*v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804, paragraph two of syllabus (1978). An alleged error does not constitute plain error under Crim.R. 52(B) unless but for the error, the result of the trial would have been different. *State v. Campbell*, 69 Ohio St.3d 38, 41, 630 N.E.2d 339 (1994), citing *Long,* supra.

**{¶58}** Bell takes issue with the prosecutor's statements in closing in which he summarizes the details of the shooting from the victims' perspectives. He claims that the statements constitute prosecutorial misconduct since the statements concerned the heinous nature of the offense. Bell suggests that the state's argument should have been limited to comments regarding the identification of Bell as the shooter because that was the only issue at trial. We disagree.

**{¶59}** Bell must first show that the prosecutor's statements were improper. Then he must demonstrate that the improper comments prejudiced the outcome of the trial. In assessing whether it was prejudicial, a reviewing court must review the closing arguments as a whole. *State v. Slagle*, 65 Ohio St.3d 597, 606-607, 605 N.E.2d 916 (1992).

**{¶60}** Upon reviewing the record with regard to Bell's claimed error, we cannot hold that the admission of the prosecutor's closing arguments constitutes plain error. The state's closing statements detail the offense in order to show that it met its burden and had established the necessary elements of the offense, including the fact that the defendant entered this home without permission and shot these women in their own bedroom. The state was not limited to discussing the identity of the shooter. Although the facts of this case may raise emotion and sympathy for the victims, the state recited the unfortunate details of the case. It did not go into unnecessary or graphic detail.

Thus, Bell has not shown that but for the error, he would have been found not guilty, and as such, his third assignment of error lacks merit.

{¶61} Based on the foregoing reasons, Bell's assignments of error lack merit, and the judgment of the Lake County Court of Common Pleas is affirmed.


TIMOTHY P. CANNON, P.J.,

CYNTHIA WESTCOTT RICE, J.,

concur.